UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
V.                              )     Crim. No. 99-10371-DJC
                                )
JAMES J. BULGER                 )
_____)

### DEFENDANT'S MOTION FOR RULE 16 (a)(1)(C) DISCOVERY

The defense will prove that the Department of Justice ("DOJ") has employed a modus operandi of diversionary tactics, concealment, and selective dissemination of information in misleading ways to cover up the controversial methods they use to pursue their institutional objectives. The DOJ has consistently used these tactics throughout its history, particularly in their pursuit of La Cosa Nostra ("LCN"). From Joseph Barboza, to Gregory Scarpa, to Mark Rossetti, the DOJ continuously cultivates inappropriate relationships with high-ranking members of organized crime, including murderers, to pursue its objectives while simultaneously concealing the true nature of these relationships.

The historical knowledge and conduct of the DOJ is highly relevant to the case of James Bulger. The DOJ's conduct will show that the defendant's immunity agreement was not an isolated incident but rather one example of the DOJ's ongoing practice of

1

making agreements with alleged high-level criminals. Without
this evidence, the factfinder will not be able to comprehend or
appreciate the DOJ's willingness and motive to provide James
Bulger immunity, and then falsely characterize him as an
informant. The factfinder must learn of the DOJ's practice of
pursuing organized crime by providing promises, rewards,
assistance, protection, money, and immunity to anyone that may
assist them in a way that furthers the DOJ's interest and
protects its institutional reputation.

The defense intends to prove the following at trial:

1.   The DOJ historically has promised not to prosecute
     organized crime figures if the arrangement supports their
     objectives, and then, will later deny the arrangements.
     This pattern of conduct exists at least back to when the
     DOJ allowed Barboza to falsely testify against innocent
     men to help achieve its goals of dismantling of LCN. When
     Barboza recanted and the DOJ risked being exposed, they
     engaged extraordinary efforts to cover up the fraud. As
     the DOJ's war against LCN continued through the 1970's
     and 1980's, the DOJ continued their pattern of conduct by
     engaging in relationships with numerous murderers,
     including, but not limited to, Stephen Flemmi. These
     relationships and promises were known at the highest
     levels of the DOJ. When the DOJ was exposed in 1998 by

the hearings conducted by Judge Mark Wolf in this Court, the Department attempted to insulate its higher levels by creating a "rogue agent" theory and placing the blame for their entire institutional practice on a low-level DOJ employee, John Connolly. Despite congressional hearings and over nineteen civil law suits, this institutional pattern of conduct continues today.

2. Through Jeremiah O'Sullivan, the DOJ agreed not to prosecute James Bulger in return for his assistance with a DOJ objective that did not include providing information about others. Jeremiah O'Sullivan embraced this DOJ objective, and enforced the immunity agreement for over twenty-five years.

3. The DOJ has fraudulently characterized James Bulger as an informant despite knowing that the "Bulger informant file" was fabricated. Prosecutors have previously argued that the file was a sham, but now contradict their own past arguments. This is yet another attempt to silence James Bulger to conceal the existence of his immunity agreement with the DOJ.

4. The DOJ hides necessary discovery relevant to these matters. This is consistent with their discovery tactics which led Judge Nancy Gertner to conclude that "[t]here is no doubt that there was bad faith in connection with

the government's conduct during discovery. The government

played a shell game – dumping vast numbers of documents

that were so redacted as to be incomprehensible,...

culminating in the disclosure that trial counsel was

denied access to the unredacted documents." Limone v.

United States, 815 F. Supp. 2d 393, 409 (D. Mass. 2011).

The United States Attorney's Office hides behind an

overbroad protective order, objects to the production of

DOJ records, and maintains that they do not have access

to DOJ records that are not provided to them - unless

there is a tactical need for the United States Attorney's

Office to borrow a fraction of the information to promote

their cause. The United States Attorney's Office is not

opposed to using DOJ records when it furthers the

prosecution, for example, in its immunity filing. See

"Margolis Affidavit", Doc. 830-1 (Mar. 1, 2013). The

United States Attorney's Office cannot therefore assure

the Court that DOJ records were adequately reviewed or

provided to the defense. James Bulger's immunity

agreement is with the DOJ, not the United States

Attorney's Office. Without access to DOJ records, it is

impossible to obtain relevant evidence that support that

the DOJ granted James Bulger immunity. This shell game is

another example of the DOJ's historical pattern of

conduct. Preventing access to discovery is a diversionary tactic designed to prevent the jury, the public, its adversaries, and the victims' families from learning the truth about the DOJ's knowledge, conduct and liability for the carnage left in their wake.

## REQUEST FOR DISCOVERY

The defendant renews his November 2, 2012 motion for discovery. (Doc. 768)[1]. Specifically, the defendant renews certain requests for disclosure of DOJ correspondences and communications pertaining to the defendant and members of the so-called "Winter Hill Gang":

1.   All correspondence between the United States Attorney's Office and the Strike Force relative to James Bulger, Stephen Flemmi, John Martorano, James Martorano, Patrick Nee, Howard Winter, or the "Winter Hill Gang."

2.   All correspondence between the United States Attorney's Office and the Department of Justice relative to James Bulger, Stephen Flemmi, John Martorano, James Martorano, Patrick Nee, Howard Winter, or the "Winter Hill Gang."

3.   All correspondence between the United States Attorney's Office and the Federal Bureau of Investigation ("FBI") relative to James Bulger, Stephen Flemmi, John Martorano, James Martorano, Patrick Nee, Howard Winter, or the "Winter Hill Gang."

4.   All correspondence from Robert Mueller to any other member of the Department of Justice relative to James Bulger, Stephen Flemmi, John Martorano, Kevin Weeks.

---

[1] Judge Stearns denied most of the defendant's requests for discovery without a hearing by Order dated Dec. 6, 2012. The court's restrictive interpretation of the government's discovery obligations deprived the defense of meaningful access to relevant discovery.

5.    All prosecution memoranda of both the United States
      Attorney's Office and the Strike Force related to all
      investigations of Winter Hill members from 1967 –
      present.

6.    The 1/29/79 memorandum addressed to Gerard McGuire from
      Assistant U.S. Attorneys/Strike Force Attorneys Gerald
      McDowell and Jeremiah O'Sullivan, referenced in the
      Florida v. Connolly pleading (Bates 00272095) (note, it
      is believed that the pleading mistakenly refers to
      Gerard as "Gerald").

The defendant further moves for the following discovery.

7.    The defendant also moves for discovery of the names and
      dates of service for the following: (1) Department of
      Justice attorneys assigned to the Strike Force from
      1972 to 1994, (2) Chiefs of the Criminal Division from
      1972 to 1994, (3) Chiefs of the General Crimes Section
      from 1972 to 1994 and (4) the Special Agents in Charge
      of the Drug Enforcement Administration from 1972 to
      1994.

The defendant incorporates by reference the arguments
contained in his November 2 motion. The defendant further argues
that the requested discovery items have become even more relevant
in light of the Government's recent filing of the affidavit of
AUSA David Margolis (hereinafter, the "Margolis Affidavit", see
Doc. 830-1) and the likelihood of a pretrial hearing on the
question of immunity.

These individuals are potential witnesses. Their
identities are material to the preparation of the defendant's
case so that he can respond to the Margolis Affidavit and
prepare for a likely pretrial hearing on immunity.

## RECITATION OF RELEVANT FACTS

In order to appreciate the relevance of the defendant's discovery requests, it is necessary to understand DOJ's historical methods. Otherwise, the factfinder may misconstrue the DOJ's conduct relative to James Bulger as "incredible" as the Government repeatedly trumpets. The DOJ should not be permitted to shield itself from public scrutiny for the agreements it made in furtherance of its pursuit of its crown jewel, the destruction of La Cosa Nostra.

I.    **THE DEPARTMENT OF JUSTICE ENGAGES IN AN INSTITUTIONAL PATTERN OF CONDUCT OF FORMING CLOSE RELATIONSHIPS WITH KNOWN MURDERERS TO ACHIEVE ITS OBJECTIVES AND THEN COVERING UP ITS RELATIONSHIPS TO PROTECT ITS IMAGE**

*"I must tell you this, that I was outraged--outraged—-at the fact that if [the exculpatory documents] had ever been shown to me, we wouldn't be sitting here . . . I certainly would never have allowed myself to prosecute this case having that knowledge. No way." Testimony of Jack Zalkind, lead prosecutor of Peter Limone and his codefendants, Hearing Before the Committee on Government Reform, House of Representatives, One Hundred Seventh Congress, Second Session, May 11, 2002 at 21.*

A.    **THE BEGINNING: JOE BARBOZA**

1.    The DOJ has a tortured history of protecting itself and its convictions at the cost of life, liberty, and the truth. The DOJ's responsibility in the wrongful prosecutions of Joseph Salvati, Peter Limone, Henry Tameleo and Louis Greco, and the subsequent cover-up, is a glaring example of the DOJ's method.[2]

---

[2] Salvati and Limone spent decades in prison before they were finally exonerated in 2001. Tameleo and Greco died in prison.

2.   After the men were wrongfully convicted, Barboza, the
     Government's cooperating witness, recanted his testimony
     and admitted that he framed the innocent convicts. <u>Limone
     v. United States</u>, 271 F. Supp. 2d 345, 352 (D. Mass. 2003).

3.   The DOJ took the extraordinary step of sending former
     employees, including former Strike Force Chief Edward
     Harrington, to testify on Barboza's behalf in a murder
     prosecution in California. <u>See</u> O'Sullivan Dep., 10/24/2004,
     00272546-47. The DOJ was not protecting Barboza. It was
     protecting itself, its reputation, and its LCN convictions.

4.   The DOJ's conduct with regard to Barboza is directly
     relevant to the case at bar. In order for the factfinder to
     fairly assess whether it should enforce the immunity that
     Jeremiah O'Sullivan granted James Bulger, the factfinder
     must hear about the DOJ's historical method of operation.
     Otherwise, it will be misled by the Government's
     diversionary claims that the promise of immunity to James
     Bulger was unique, absurd, or outrageous.

5.   Special Agent H. Paul Rico persuaded Barboza to perjure
     himself in the Edward Deegan murder trial as the state's key
     witness, falsely implicating Henry Tameleo, Ronald Cassesso,
     and Peter Limone. Memorandum from DeLoach to Gale, 3/31/70,
     <u>Everything Secret Degenerates: The FBI's Use of Murderers
     as Informants</u>, Third Report by the Comm. on Gov. Reform,
     108th Cong. 83 (2002), Exhibit 308, at 1675-77.
     (hereinafter, "<u>Everything Secret at ___</u>").

6.   Rico was recommended for an incentive award for developing
     Joseph Barboza and other Top Echelon Informants in the Boston
     area. <u>Everything Secret</u>, Exhibit 308, at 1675-77. <u>Everything
     Secret</u>, Exhibit 308, at 1675-77; <u>Everything Secret</u>, Exhibit
     310, at 1682.

**B.   DESPITE BARBOZA'S RECANTATION, THE DEPARTMENT OF JUSTICE
       TOOK EXTRAORDINARY STEPS TO PRESERVE ITS WRONGFULLY-
       OBTAINED CONVICTIONS**

7.   DOJ employees, including many witnesses relevant in James
     Bulger's case, continued in the effort to silence the four
     wrongfully convicted men. In 2006, former U.S. Attorney
     William Weld testified in his deposition that Jeremiah
     O'Sullivan was aware of the allegations that Barboza was
     lying. Weld Dep., 6/7/2006, 00345646.

8.   O'Sullivan and former FBI supervisor James Ring made an
     effort to object to parole for Limone through the use of
     Weld, who signed letters drafted by O'Sullivan and Ring.
     See Everything Secret, Exhibit 770, at 2790. Weld added that
     he received a lot of negative information from Jeremiah
     O'Sullivan about Peter Limone. Weld Dep., 6/7/2006,
     00345701. See also, Albano 302, 7/10/2001, 00258197.

9.   Former FBI supervisor John Morris, an immunized Government
     witness, said he discussed the Parole Board's letter with
     the Strike Force, of which Jeremiah O'Sullivan was the lead
     attorney. Letter from Morris, 12/16/1982, 00086491.

10.  In Limone v. United States, it was alleged as follows:

          [A]gents Morris and Connolly attempted to
          discourage members of the Massachusetts Advisory
          Board of Pardons from recommending commutation for
          Limone by providing false information directly and
          through U.S. Attorney William Weld. Notwithstanding
          this pressure, on August 1, 1983, the Board voted
          to recommend commutation of Limone's sentence. FBI
          agents including Morris and Connolly then channeled
          false information to the office of the Governor to
          discourage commutation. On September 20, 1983,
          Governor Dukakis denied the petition for
          commutation.

          In an attempt at intimidation, FBI agents including
          Morris and Connolly caused state law enforcement
          officials and agents to investigate members of the
          Advisory Board of Pardons who had voted in favor of
          commutation to determine if they were influenced by
          organized crime. On December 21, 1987, the Board
          unanimously denied a hearing on a subsequent
          petition for commutation by Limone, after receipt
          of more false information from defendants.

          In 1983 and 1986, Greco also applied for a
          commutation of his sentence. The Board recommended
          commutation on each occasion, but FBI agents sought
          to discourage Governor Dukakis, in 1985, and
          Governor Weld, in 1993, from granting the petition.
          In each instance, the petition was turned down.

Limone v. United States, 271 F. Supp. 2d 345, 352 (D. Mass. 2003).

**C.   AFTER BARBOZA, LCN CONTINUED TO BE THE DEPARTMENT OF JUSTICES'S NATIONAL PRIORITY**

11.   During the late 1970's and early 1980's the stated national priority of the FBI's Organized Crime Program was the takedown of La Cosa Nostra. Attorney General Memo of Organized Crime Program, 4/23/1980, 00083566. Vast amounts of resources and accolades were bestowed upon DOJ's participants. The DOJ'S effort resulted in the indictments of numerous LCN figures, such as the Angiulos of the North End, and secret recordings of various organized crime locations, including an LCN initiation ceremony.

12.   The DOJ identified that the LCN was a national threat and national priority. O'Sullivan 302, 3/30/2000, 00070518.

13.   In 1980, the Director of the FBI instructed that the majority of resources in the Organized Crime Program should be expended and directed against LCN. Attorney General Memo of Organized Crime Program, 4/23/1980, 00083566.

14.   In the mid-1970's Special Agent John Connolly told Flemmi that he wanted him to be an informant because he had access to members of LCN, including "[Baione] the number two member of the hierarchy. . . [and Jerry Angiulo] the boss of the LCN. . ." McIntyre v. United States, 6/8/2006, at 00312517-18. Flemmi stated that, "He knew I traveled in those circles at times." Id. at 00312518.

15.   "During the early 1980's, the [FBI's Organized Crime] Squad focused exclusively on several operations to obtain and analyze Title III wiretaps and electronic surveillance of Cosa Nostra targets: 'Bostar' was an operation to place a Title III intercept at 98 Prince Street, the headquarters of Gennaro Angiulo; and 'Mandarin' was an operation to place a Title III intercept at 51 North Margin Street, the headquarters of Illario Zannino." McIntyre v. United States, 447 F. Supp 2d 54, 63 (D. Mass. 2006).

**D.   IN THE 1970'S AND THE 1980'S, THE DEPARTMENT OF JUSTICE CONTINUED TO BARTER WITH MURDERERS, LIKE BARBOZA, IN PURSUIT OF LA COSA NOSTRA**

16.  The Top Echelon informant program necessarily required
     relationships with known criminals and murderers. In United
     States v. Salemme, John Morris stated: "[T]he very
     definition of a TE. . . [is] somebody who has access to the
     highest levels of organized crime at the policy making
     level." Testimony of Morris, 4/22/1998, 00303270. Morris
     reinforced that "inherent in their responsibilities as top
     echelon informants was that they engage in this very
     criminal conduct in order to have access to the information
     [Morris] was seeking[.]" Id.

17.  Flemmi and Rico's relationship developed to the point that
     they communicated often. Rico was primarily interested in
     the LCN. Rico gave information to Flemmi about his rivals
     during the gang war. Davis/Hussey/Litif v. United States,
     testimony of Stephen Flemmi, 7/9/2009, 00336022-23,
     00336031-32.

18.  Before one of Flemmi's rivals, George McLaughlin, was
     arrested, Rico and his partner, Special Agent Dennis Condon,
     spoke to Flemmi in Roxbury. Rico asked Flemmi for a gun to
     kill McLaughlin, and Flemmi gave him one. Flemmi Dep.,
     Florida v. Connolly, 6/16/2006, 00323174. Rico planned to
     plant the gun on McLaughlin so agents making the arrest
     could kill him. Davis/Hussey/Litif v. United States,
     testimony of Stephen Flemmi, 7/9/2009, 00336035.

19.  After McLaughlin was arrested, Rico told Flemmi that other
     agents were planning to kill McLaughlin, but they were
     unsure of the fifth agent's trustworthiness, so they did not
     follow through on the plan. Id. at 00336036.

20.  Rico directed information to Flemmi, informing him that
     Edward "Punchy" McLaughlin was taking the bus on Spring
     Street in West Roxbury every day to attend his brother's
     criminal trial in Boston. Flemmi Dep., Florida v. Connolly,
     6/12/2006, 00322443.

21.  Flemmi was waiting for Punchy McLaughlin at the bus with
     Frank Salemme. Punchy McLaughlin was getting on the bus, and
     Flemmi shot him six times. Flemmi Dep., Florida v. Connolly,
     6/12/2006, 00322443.


E.   **THE DEPARTMENT OF JUSTICE CONTINUES TO ASSIST MURDERERS
     TO FURTHER THEIR CAMPAIGN AGAINST LCN**

22. Attorney John Fitzgerald represented Barboza. Attorney Fitzgerald was intimately involved in the DOJ's courting and presentation of Barboza as a witness.

23. Flemmi and Salemme attempted to murder Fitzgerald by placing a bomb in his car. Fitzgerald suffered serious injuries and a leg amputation. After the murder attempt, Rico tipped Flemmi that he and Salemme were about to be indicted for the murders of Will Bennett and Richie Grasso and Flemmi fled to Montreal. Florida v. Connolly, testimony of Flemmi, 9/22/2008, 00266219, 00266221.

24. After Flemmi murdered Peter Poulos in the Nevada desert, the DOJ protected its top echelon (TE) informant. "There is substantial evidence that the FBI interfered with the Las Vegas police investigation of the murder of Peter J. Poulos to protect its informants. In this instance the FBI sought to protect top echelon informant Stephen Flemmi from being prosecuted for the Poulos murder." Everything Secret at 91.

25. Nevada law enforcement developed their own case without assistance from the FBI. After Nevada law enforcement issued a criminal complaint charging Flemmi with the murder, they believed FBI interfered with their case. Specifically, there was no assistance in extraditing Flemmi. As Lt. Tom Monahan told the Committee Staff, "it is clear that FBI asked the DA to step aside and not do anything." Everything Secret at 83.

26. Flemmi kept in contact with Rico while a fugitive. Florida v. Connolly, testimony of Stephen Flemmi, 9/22/2008, 00266222. Rico and Flemmi stayed in contact at least once a year. Id. In 1974, Rico advised Flemmi that he could return to Boston. Florida v. Connolly, testimony of Stephen Flemmi, 9/22/2008, 00266223; Flemmi Dep., 6/15/2006, 00322988.

27. Although Salemme was tried and convicted of the attempted murder of John Fitzgerald and served over ten years, McIntyre v. United States, trial testimony, 6/6/2006, 00312358, the charges against Flemmi were dismissed, as Rico promised. McIntyre v. United States, Flemmi trial testimony, 6/6/2006, 00312357.

28. Rico was not acting alone. Flemmi testified Agent Condon informed him that the flight warrant had been taken care

of. <u>McIntyre v. United States</u>, Flemmi deposition testimony, 04/28/2005, 00314857.

29. The DOJ continued to protect Flemmi from prosecution from the 1970's until the early 1990's.


II.  **UPPER-LEVEL SUPERVISORS WERE AWARE OF THE CLOSE RELATIONSHIPS BETWEEN THE DEPARTMENT OF JUSTICE AND KNOWN MURDERERS**

   **A. THE UPPER LEVELS OF DOJ HAD DIRECT KNOWLEDGE ABOUT SUSPECTS IN MURDER INVESTIGATIONS AND DID NOTHING ABOUT IT**

1. In January 20, 1988 a memo from then-Associate Attorney General William Weld to John Christopher "Jack" Keeney and David Margolis stated that "Tina" reported that Connolly and Boston Police Official Ed Walsh were selling information to Bulger and Flemmi and that's how they find wiretaps. Memo to Weld, 1/20/1988, 00090450.

2. The DOJ learned that the information was coming from a criminal associate in the Boston area named Joseph Murray. Murray was incarcerated and using an anonymous individual to send information to the DOJ under the name "Tina." Report of SA Arena, 7/16/1997, 00090754-55.

3. An August 15, 1988 memo from Weld's secretary to Margolis and Keeney informed "there is another Agent beside John Connolly who feeds Bulger, Flemmi, Nee and Weeks information." 00125709. There is no information provided in discovery to determine whether any investigation was conducted by Margolis, Keeney, or any other official in Washington. <u>See</u> Woolley 302, 9/8/1988, 00152820.

4. Margolis does not appear to have ever acted on the information from William Weld about a witness (00042258) who "claims he talked to Whitey and Nee as they sat in the car waiting for Halloran on Northern Avenue." <u>See also</u> Woolley 302, 9/8/1988, 00152820.

5. A November 9, 1988 memo about the Tina calls stated the caller sought a change of federal prison conditions in "exchange for information on Bulger and Flemmi with the name of a witness to the killing of Brian Halloran and Bulger and [Patrick] Nee. The person I am speaking for has

bad blood with Nee over the murder and torture of his friend Bucky Barrett." Memo, 11/9/1988, 00152839.

6.    No prosecutor or any DOJ official from Washington appears to have done any follow-up on the matter. Instead, there is only one interview of Murray by FBI Special Agents Clark and Quinn on June 8, 1989. Clark testified he was told to ask questions about allegations against the agent. Clark could not recall any other requests by his superiors to investigate any of the murders or crimes reported by Murray. United States v. Salemme, testimony of Edward Clark, 6/3/1998, 00293877. After Clark's interview, the Special Agent in Charge of the Boston FBI recommended for "this inquiry to be closed, and no administrative action taken." Airtel to Director FBI from SAC Boston, 8/4/1989, 00125699-700.

7.    Flemmi reported that the LCN has connections to a high-level official in the DOJ. The connection was linked to the Patriarca family, as well as Boston LCN. Flemmi did not remember the exact name, but recalled it starting with M. Flemmi was shown a list of names and immediately identified Margolis. Flemmi insert, 5/16/1983, 00002572.

**B.    IN AN ATTEMPT TO SHIELD HIGHER LEVEL DOJ EMPLOYEES FROM LIABILITY, THE DEPARTMENT OF JUSTICE CREATED A ROGUE AGENT THEORY AND PURSUED JOHN CONNOLLY**

The defense will need DOJ records to show that John Connolly was not acting alone as a rogue agent and show instead there was an institutional culture of deal-making with organized crime figures. The concerted effort to scapegoat John Connolly as the only culpable member of the DOJ is in furtherance of its effort to keep the immunity agreement with James Bulger hidden from the public. It would be undoubtedly embarrassing to the DOJ to publicly admit that it was replete with controversial bargaining, wrongdoing and criminal activity. To support the rogue agent theory, the Government paid a high price for the conviction of Connolly – allowing the actual killers to go free and immunizing his equally culpable colleagues.

8.    Prior to charging Connolly, the FBI engaged in an alleged investigation known as the "Prouty Report" in an attempt to deflect liability. This attempt was largely unconvincing. The August 13, 1997 report found no criminal activity by DOJ

employees within the five-year statute of limitations and that "no current employees" of the DOJ were in violation of FBI policies. When asked by the Boston Herald if the Prouty investigation was a "whitewash", a spokeswoman for the FBI denied that it was. Maggie Mulvihill, J.M. Lawrence & Jack Meyers, "Ex-agent to Testify on Corruption," Boston Herald, 4/12/2001, at p. 1, 00158999.

C.   **WHEN THE DEPARTMENT AGAIN HAD TO RELY ON MURDERERS TO PROTECT ITS IMAGE, THEY FOUND A WILLING PARTNER IN BARBOZA'S FRIEND, JOHN MARTORANO**

9.   Government witness John Martorano was friends with Barboza and admitted that he "probably" committed crimes with him, "maybe" extortions, and it was hard to remember because Martorano had committed so many crimes. United States v. Connolly, testimony of John Martorano, 5/13/02, at 150.

10.  Martorano knew Barboza got himself out of jail by testifying to what the government wanted. United States v. Connolly, testimony of John Martorano, 5/14/2002, 00352699.

11.  Martorano learned through his friend Barboza the value of providing the Department of Justice with information they desired to secure a conviction. Martorano would borrow from his friend's methods and over thirty years later would assume the same role as Barboza in striking a similar bargain with the DOJ. The DOJ would be a willing partner.

12.  Martorano would strike his own deal and negotiate leaving out principals in criminal conduct, including murder, in exchange for his freedom. He was allowed to limit his testimony to a specific list which excluded many culpable parties. Martorano was needed to provide a link to Connolly even though he had never met or spoken to Connolly. Martorano was allowed to refrain from implicating his family, friends, and other criminal associates in countless crimes and murders in order to assist in their effort to convict John Connolly. Kevin Weeks was given this privilege as well and was allowed to falsely claim he did not know who was in the back seat of the hit car that was responsible for the Halloran and Donahue murders. See United States v. Connolly, testimony of Kevin Weeks, 5/15/2002, 00353390 ("[Q:] Are you testifying you didn't know who was in the back of Mr. Bulger's car? [A:] I could speculate who was in the back, but I didn't see their face. . . [Q:] Didn't you know who it was? [A:] No.")

### C.   THE DEPARTMENT OF JUSTICE CONTESTED THE CIVIL CASES AND CONTINUED TO HIDE INFORMATION

13.   The DOJ was forced to accept responsibility for its actions by a court of law. All of the Limone convictions were overturned, and subject to a lawsuit. Limone v. United States, 271 F. Supp. 2d 345 (D. Mass. 2003), aff'd by Limone v. Condon, 372 F.3d 39 (1st Cir. 2004). Judge Gertner issued judgments in excess of one hundred million dollars.

14.   The DOJ fought the civil claims against them and their methods were denounced by Judge Gertner. Judge Gertner found "there was a pattern of bad faith conduct . . . that is the government's conduct in connection with discovery." Limone v. United States, 2011 WL 2489965 at *1 (D. Mass. June 20, 2011). "The government blocked access to the relevant documents -- hiding behind specious procedural arguments, baseless motions to stay and 'emergency' motions to defer production, culminating in a frivolous interlocutory appeal." Id. at *2.

15.   The DOJ has vigorously fought the victims' families. As stated above, the trial judge in Limone found that the Government acted in bad faith with regards to its discovery obligations in the civil trial she presided over. Limone v. United States, 815 F. Supp. 2d 393, 409 (D. Mass. 2011). Another judge admonished the Government for taking contrary positions in the civil before them and the criminal cases. See Castucci v. United States of America, No. 02-11312-RCL (D. Mass) Motion Hr'g Tr. 37:15-23 (Feb. 19, 2008). In other cases still, the families prevailed on the merits at trial, just to be brought back to court by the government and to lose their compensation on a Statute of Limitations technicality. E.g., Donahue v. United States, 634 F.3d 615 (1st Cir. 2011). Judge Young recently ruled that the statute of limitations does not bar suit against individual government officials; litigation concerning the victims and the government is ongoing. Donahue v. Connolly, 890 F. Supp. 2d 173 (D. Mass. 2012).

### D.   THE DEPARTMENT OF JUSTICE'S PATTERN OF CONDUCT CONTINUES TODAY

16.   The congressional hearing in 2002 raised issues and was met by vows of change by the DOJ. But the concerns resulted in little other than the fact that the DOJ's controversial

practices continued to resonate. The DOJ's continued to avoid scrutiny until 2009 with the arrest of alleged murderous informant Mark Rossetti. The details have not been well-publicized.

17. WBUR's investigative journalist David Boeri reported on August 12, 2011 that "[Mark Rossetti] was caught by State Police conducting 40 conversations with an FBI agent, according to court records. From this State Police determined Rossetti was an FBI informant. He was even using a phone given to him by the FBI.", "Sources: Alleged Mobster Rossetti Was FBI Informant," WBUR, 8/12/2011, available at http://www.wbur.org/2011/08/12/atc-rossetti. Noting the reaction of the FBI, Boeri reported "Friday afternoon the local FBI spokesman said that a statement is under consideration but for the time being they are sticking with their earlier statement: 'The Department of Justice rules require us to report criminal wrongdoing by any of our sources. The FBI followed those guidelines.'" Id.

18. On March 19, 2013, Matt Connolly of the Patriot Ledger reported that "[e]arlier this week Attorney General Martha Coakley was talking about *the leader of an extensive and violent* **criminal enterprise that for decades** *threatened the safety of our community.*" She was referring to an FBI Top Echelon informant who was given passes on his crimes by the FBI, who is suspected of having murdered several people, and was involved in extortion and drug dealing, and had served federal time for bank robbery." Matt Connolly, Time for Flemmi to out himself, Patriot Ledger, Mar. 19, 2003.

19. United States Senator Charles Grassley launched his own investigation of the FBI's handling of Rossetti after his informant status was publicly revealed in 2011. Grassley stated "I'm not running the FBI but this has been going on too long. There have to be big changes." "I'm not saying just in this case in Boston, in Massachusetts, and I'm not saying it just with the FBI, I'm saying across government, if heads don't roll you don't get any change of behavior," he said. Reported on myfoxBoston.com (Mar 21, 2013).

**III. DISCOVERY FROM DEPARTMENT OF JUSTICE FILES IS NECESSARY TO SHOW THE DEGREE TO WHICH HIGH-LEVEL SUPERVISORS IN THE DEPARTMENT OF JUSTICE WERE AWARE OF O'SULLIVAN'S ACTIONS**

    **A.   THE 1979 RACE FIX INDICTMENTS**

1.    In 1979, O'Sullivan indicted a number of organized crime figures in relation to fixed horse races. The government's key witness in the race-fix case, Anthony Ciulla, had inculpated Bulger and Flemmi during his grand jury testimony and had named them as participants in the fixing scheme during his testimony in state court in New Jersey. Bulger and Flemmi were listed as unindicted co-conspirators in the case. Salemme, 91 F. Supp. 2d 141, 201 (D. Mass. 1999) (citing United States v. Winter, 663 F.2d 1120, 1124, 1127, 1137 (1st Cir. 1981)).

2.    The DOJ has maintained that Bulger was omitted from the indictment because Morris and Connolly told O'Sullivan that Bulger was one of Connolly's sources. However, in a 1997 interview with the FBI, O'Sullivan said that he had never been told that Bulger was an informant while he was a prosecutor. O'Sullivan 302, 7/31/1997, 00090647.

3.    When he testified before Congress in 2002, O'Sullivan made several attempts to explain his decision not to indict Bulger. He claimed that he had already decided not to indict Bulger because of a lack of corroborating evidence. E.g., Investigation of Allegations of Law Enforcement Misconduct in New England: Hearing Before the H. Comm. on Gov. Reform, 107th Cong. 300-02 (2002) (hereinafter "House Hearings"); O'Sullivan FBI 302 03/27/2000, 00070521. O'Sullivan, however, was unable to explain why he indicted another Winter Hill member, James Sims, even though the evidence against him was uncorroborated. E.g., Everything Secret Degenerates: The FBI's Use of Murderers as Informants, Third Report by the Comm. on Gov. Reform, 108th Cong. 2d Session 58 (2002) (hereinafter "Everything Secret Degenerates").

4.    The Committee determined that O'Sullivan's testimony was "false." Id. The Committee noted:

        When confronted with his own memorandum that Stephen Flemmi and James Bulger participated in a meeting to discuss the race-fixing scheme, that Bulger and Flemmi "would help find outside

> bookmakers to accept the bets of the group"
> that they were financiers of the conspiracy and
> that Flemmi appeared to be a part of the core
> working group of the conspiracy, O'Sullivan
> replied, "You've got me." <u>Id.</u>

5.  Judge Wolf, of the District Court of Massachusetts,
    similarly did not believe O'Sullivan's explanations
    regarding Bulger's omission from the race-fix case. Though
    O'Sullivan was ill and was unable to testify at Judge
    Wolf's hearings held as part of the <u>United States v.</u>
    <u>Salemme</u> proceedings, the Court determined that Morris's
    representation that "no prosecutable case developed against
    [Bulger] in the opinion of the Strike Force Attorney
    handling the matter" was not true. <u>United States v.</u>
    <u>Salemme</u>, 91 F. Supp. 2d 141, 201 (D. Mass. 1999).

6.  Special Agent Thomas Daly, the case agent on the race-fix
    case, testified that he did not agree with O'Sullivan's
    decision to leave Bulger and Flemmi out of the indictment.
    <u>Florida v. Connolly</u>, testimony of Thomas Daly, 10/15/2008,
    00268971.


**B.    THE LANCASTER STREET GARAGE INVESTIGATION**

7.  Massachusetts State Police (MSP) became suspicious that
    Bulger and Flemmi were using the Lancaster Street as a base
    of operations. However, when the MSP approached O'Sullivan
    about the Lancaster Street Garage surveillance, O'Sullivan
    was adamant about involving the FBI in the investigation.
    Long 302, 6/17/1999, #00168393.

8.  MSP Trooper Robert Long asked O'Sullivan if the MSP could
    cooperate in the investigation with the DEA or ATF instead.
    O'Sullivan refused, explaining that MSP had to work with
    the FBI in order for O'Sullivan to keep his working
    relationship with the FBI functioning. MSP Colonel
    O'Donovan did not want to work with John Morris; Long
    suggested that Dave Brady work the investigation instead,
    and Long did not want to provide the FBI with specifics of
    the investigation. O'Sullivan told Long that Brady would be
    required to report back to the FBI. <u>Id.</u>

9.  After a wire tap was installed at the garage, it became
    clear to the MSP troopers that the investigation had been
    compromised. Only one conversation was picked up, during

which Bulger could be heard discussing his respect for the police and their difficult job. Fraelick 302, 5/12/1999, 00168192. Bulger stopped using the garage for conversations thereafter, and the microphone only picked up static. <u>Id.</u> at 00168192-93.

10. John Morris approached Boston Police Department Sergeant Bob Ryan at a retirement party and told Ryan that he heard about the Title III surveillance at the Lancaster Street Garage and that the targets knew about it too. <u>Id.</u> at 00168193. After this incident, MSP Colonel O'Donovan called O'Sullivan and told him about the conversation between Ryan and Morris. O'Sullivan daily log, 3/14/2000, 00070277.

11. On July 31, 1997, O'Sullivan was interviewed by the FBI and stated that he had "no involvement in the Lancaster Garage Title III investigation until after the fact". O'Sullivan 302, 7/31/97, 00090645.

12. Flemmi testified that Connolly reported a conversation with O'Sullivan. According to Connolly, O'Sullivan informed him that he was funding the Lancaster Street Garage wiretap and that Connolly should tell Bulger and Flemmi about the investigation. <u>United States v. Salemme</u>, Flemmi testimony, 8/20/1998, 00298364. Flemmi said Connolly then met with him and told him about the O'Sullivan warning.

13. In an August 30, 2004 deposition, O'Sullivan claimed the FBI's July 31, 1997 report that he had no involvement in the Lancaster Street investigation was wrong. O'Sullivan dep., 8/30/2004, 00349345. In an October 24, 2005 deposition, O'Sullivan again denounced the FBI report and claimed he had never seen the report before. O'Sullivan Dep., 10/24/2005, 00343964.

14. After the Lancaster Street Garage investigation was compromised, there was no grand jury investigation into how the garage surveillance was leaked to the targets.

### C.   **BAHORIAN INVESTIGATION**

15. The FBI was pursuing John Bahorian regarding bookmaking charges including bribery of local police. The FBI intended on using wiretaps to record conversations between involved parties as evidence of the crimes. This investigation was compromised.

16. On April 16, 1985, Lieutenant ("Lt.") James Cox of the
    Boston Police Department agreed to cooperate with the
    United States. Though the agreement was endorsed by Strike
    Force Attorney Diane Kottmyer (Id. at 00259768), Strike
    Force Chief Jeremiah O'Sullivan was also involved in this
    arrangement. O'Sullivan's daily log contains an entry on
    April 15, 1985, memorializing his involvement. O'Sullivan
    daily log, 3/14/2000, 00168343. Lt. Cox was to investigate
    payoffs to Boston Police officers from bookmakers.

17. SA Robert Jordan was involved in the investigation. Jordan
    302, 7/21/1999, #00159378.

18. When Cox attempted to record Bulger and Flemmi in September
    of 1986, it became clear to Cox and Jordan that Bulger and
    Flemmi had been tipped off to Cox's cooperation. Id. at
    00159378; Cox 302, 1/24/2000, 00159350. For example, Cox
    stated in an FBI 302 report that he heard Bulger tell
    Flemmi to watch what Flemmi said after Cox approached them.
    Cox 302, 1/24/2000, 00159350.

19. After it became clear that Cox would not be able to record
    Bulger and Flemmi, Jordan asked SSA James Ring to ask
    Connolly to have Bulger and Flemmi provide any information
    they had about the bribery investigation, and to give their
    side of the story with regard to their interaction with Lt.
    Cox. Jordan 302, 7/21/1999, 00159379. When Jordan followed
    up the next day, Ring informed him that Connolly refused
    Jordan's request. Id. According to Jordan, Ring threw
    Jordan out of his office after Jordan pursued the issue
    further with him. Id.

20. The compromise of the Bahorian wiretap was never
    investigated by Jeremiah O'Sullivan or the DOJ.

**D.   BRIAN HALLORAN**

21. In January 1982, Edward Brian Halloran began offering
    information to the FBI. Halloran had just been indicted for
    the murder of George Pappas and was released on ten
    thousand dollars cash bail. O'Sullivan's daily log reflects
    a call on November 6, 1981 from John Kiernan noting that
    the imminent arrest of Jackie Salemme for the Pappas
    homicide may cause Halloran to be murdered. O'Sullivan
    daily log, 3/14/2000, 00070286. Halloran had approached the
    FBI because he wanted protection for himself and his

family, and to gain favor with regard to the criminal charges he was facing. Montanari 302, 9/1/1999, 00168296.

22.   Special Agent Leo Brunnick was assigned to be Halloran's handling agent, working with Special Agent Gerald Montanari. Halloran provided information on a number of crimes allegedly committed by Winter Hill members, including Bulger and Flemmi. Among these allegations were that Bulger, Flemmi, and John Callahan were involved in the murder of Roger Wheeler, and that John Callahan had originally asked Halloran to participate in that murder.

23.   Halloran could not secure witness protection unless a prosecutor supported his application. This fact is stated in O'Sullivan's daily log, when on March 8, 1982 (just over two months before Halloran's murder), O'Sullivan received a phone call from SA Brunnick. Brunnick informed him that Halloran's attorney was trying to get Halloran into the Witness Protection Program; O'Sullivan quickly dismissed this possibility as "bull" because a prosecutor must sponsor an applicant's entry into the program. O'Sullivan daily log, 3/14/2000, 00070289.

24.   O'Sullivan knew that people outside of law enforcement were aware that Halloran was cooperating with the FBI. O'Sullivan's phone log reflects that he learned on April 23, 1982 that Stephen Flemmi had told someone that Halloran was a stoolpigeon who was cooperating with the federal government. Id. at 00070291. In testimony before the House Committee on Government Reform in 2002, Detective Huff, who was investigating the Wheeler murder in Oklahoma, stated "I think O'Sullivan had kind of expounded upon that people knew Halloran was a snitch." House Hearings at 287. In answer to a congressman's question "So Mr. O'Sullivan indicated to you that there was an awareness that Halloran was, in fact, an informant, a snitch?" Detective Huff replied, "Yes, sir." Id.

25.   Nevertheless, O'Sullivan refused to sign off on protection for Halloran. Assistant Special Agent in Charge Robert Fitzpatrick strongly lobbied for Halloran to be put in the program. Montanari had told Fitzpatrick that he felt Halloran was in danger of being killed because of the information he was providing. Fitzpatrick 302, 7/10/1998, 00168949. Fitzpatrick alerted Morris and O'Sullivan to Halloran's situation. Id. Morris passed the information on to Connolly; O'Sullivan minimized the danger to Halloran.

Id. After being ignored by O'Sullivan, Fitzpatrick then
went directly to the U.S. Attorney, William Weld, telling
Weld that Halloran wanted to get into the Witness
Protection Program. Id. Fitzpatrick told Weld that it was
crucial that Halloran enter Witness Protection as soon as
possible. Id. Weld did not take action, and Halloran was
killed two days later. Id. Michael Donahue was also shot
and killed during this incident.

26.  O'Sullivan has advanced many explanations for his refusal
     to sponsor Halloran for the Witness Protection program,
     many of which ring hollow. O'Sullivan's daily log reveals
     several calls on this topic: he indicated that he cannot
     recommend witness protection for Halloran unless Halloran
     records Callahan's admission to the Wheeler murder
     (3/14/2000, 00070289), and that Halloran cannot receive
     witness protection if the Suffolk DA's Office did not want
     to use him as a witness. O'Sullivan daily log, 3/14/2000,
     00070290.

27.  Montanari reported that O'Sullivan would not allow Halloran
     to enter the Witness protection program without Halloran
     taking a polygraph. Montanari Dep., 9/30/2004, 00331146.

28.  O'Sullivan's insistence upon Halloran taking a polygraph
     test was inconsistent with his previously stated position
     that he would not use any witness who was subject to a
     polygraph test.

29.  O'Sullivan allowed James Flynn to be prosecuted for
     Halloran's murder, despite the indications – known to DOJ –
     that Winter Hill was behind the crime. An FBI memo reveals
     that O'Sullivan coordinated documents to be sent to Suffolk
     County prosecutors on the Flynn investigation and murder
     prosecution, but would not release documents relating to
     Halloran's cooperation with FBI. See Montanari memo,
     1/18/1985, 00246618.

30.  In an August 30, 2001 Deposition O'Sullivan would claim
     that nobody ever brought to his attention that Bulger was a
     suspect in the Wheeler, Callahan, or Halloran murders.
     O'Sullivan never initiated a grand jury investigation of
     any of these murders. O'Sullivan Dep., 8/30/2004, 00349378.

31.  Michael Huff, a Tulsa Police detective investigating the
     Roger Wheeler murder, described for Congress his impression
     after a meeting with O'Sullivan: "we came away in shock

with the information exchanged. Flemmi and Bulger were hit men known to the Feds. Retired FBI Agent Paul Rico, then vice-president of World Jai Alai, was described as a 'rogue agent' that caroused with the Winter Hill Gang members during his tenure in Boston. . . Connelly was mentioned as having some real estate transactions with the Winter Hill Gang. All the while, the official FBI line was that these agents were the 'cream of the crop.' Callahan was also discussed with O'Sullivan during this meeting and was subsequently murdered. . . just weeks later." House Hearings at 266.

IV. **THE CHARACTERIZATION OF JAMES BULGER AS AN INFORMANT IS PATENTLY FALSE AND AN ATTEMPT TO HIDE HIS IMMUNITY AGREEMENT WITH THE DEPARTMENT OF JUSTICE**

A. **THE DEPARTMENT OF JUSTICE HAS PREVIOUSLY INSISTED THAT THE SO-CALLED "INFORMANT FILE" OF JAMES BULGER WAS SUBSTANTIALLY MANUFACTURED AND ARE NOW ATTEMPTING TO TAKE A CONTRADICTORY POSITION[3]**

1. In United States v. Connolly, the Government filed a bill of particulars and took the position that numerous substantive documents placed in the manufactured "Bulger" file were false. For purposes of pursuing a conviction of John Connolly, the Government insisted that the following documents were falsified:

   b. A "justification" memorandum written to the Special Agent in Charge of the Boston office on or about December 2, 1980;[4]

---

[3] This is a routine tactic for the Department of Justice and the United States Attorney's Office during the litigation of these cases. In Castucci v. United States of America, No. 02-11312-RCL (D. Mass) Motion Hr'g Tr. 37:15-23 (Feb. 19, 2008), the Honorable Reginald C. Lindsay pointed out this technique to the Government lawyers: "Now, in the Connolly trial, the Department of Justice made these admissions. Now we come to trial and the United States is on the other side of that v. sign, but it's still the United States. It's still the Department of Justice.  And the question arises: Why is it the Department of Justice changes its mind when it said Connolly is responsible for this death back in those days, now it says Connolly isn't responsible for those deaths?"

[4] United States v. John J. Connolly, Jr. & Stephen Flemmi, 99-10428 (Feb. 2, 2001), Bill of Particulars, 00367586.

c. A "justification" memorandum written to the Special Agent in Charge of the Boston Office on or about April 1, 1981;[5]

d. File, Serial 168 – a May 24, 1982 FD-209 of BS 1544-OC (Bulger Informant File, Serial 169)

e. a May 13, 1977 FD-209 of BS 1544-TE (Bulger Informant File, Serial 29)[6]

f. a June 26, 1981 airtel authored by John Connolly from the Boston FBI Office to the Oklahoma City FBI Office

g. an April 23, 1982 FD-209 of BS 1544-0C (Bulger Informant File, Serial 166)

h. a May 14, 1982 FD-209 of BS 955-TE (Flemmi Informant File, Serial 106)

i. a May 14, 1982 FD-209 of BS 1544-0C (Bulger Informant File, Serial 168)

j. a May 25, 1982 FD-209 of BS 1544-0C (Bulger Informant File, Serial 169)

k. a June 21, 1982 FD-209 of BS 1544-0C (Bulger Informant File, Serial 170)

l. a July *9,* 1982 FD-209 of BS 955-TE (Flemmi Informant File, Serial 101)

m. a July 9,1982 FD-209 of BS 1544-0C (Bulger Informant File, Serial 171)

n. a July 14, 1982 FD-209 of BS 1544-TE (Bulger Informant File, Serial 172)

o. an April 7, 1983 memorandum from John Connolly to the Special Agent in Charge of the Boston Office (Bulger Administrative File, Serial 57)

p. an April 8, 1983 FD-209 of BS 1544-TE (Bulger Informant File, Serial 201)

q. a May 3,1984 memorandum from John J. Connolly, Jr. to Supervisor James A. Ring (Flemmi Administrative File, Serial 73)

r. a November 1, 1984 memorandum from John J. Connolly, Jr. to the Special Agent in Charge of the Boston Office (Bulger Administrative File, Serial 68)

s. a February 27, 1987 FD-209 of BS 1544-TE (Bulger Informant File, Serial 279)

t. a March 4, 1987 FD-209 of BS 1544-TE (Bulger Informant File, Serial 280)[7]

---

[5] United States v. John J. Connolly, Jr. & Stephen Flemmi, 99-10428 (Feb. 2, 2001), Bill of Particulars, 00367586; United States v. John J. Connolly, Jr. & Stephen Flemmi, 99-10428 (Apr. 3, 2000), Bill of Particulars, 00367592.

[6] United States v. John J. Connolly, Jr. & Stephen Flemmi, 99-10428 (Apr. 3, 2000), Bill of Particulars, 00367592.

[7] d through s are enumerated in United States v. John J. Connolly, Jr. & Stephen Flemmi, 99-10428 (Apr. 3, 2000), Bill of Particulars, 00367592-94.

2.      Jeremiah O'Sullivan echoed the prosecutor's position that
        FBI files were commonly fictitious. "[W]hen you dealt with
        the FBI, you never saw – if they wanted to create a
        memorandum, you never saw the memorandum that they created
        in the file and sent to Washington. So you had to be on
        your guard at all times because whatever they wrote, you
        never saw and somebody in Washington saw it." Q: "And you
        presumed, I take it, that they would write what was
        necessary to support their position?" . . . A: "Yes."
        O'Sullivan Dep., 8/30/2004, 58:10-22.

3.      The ongoing fabrication of FBI files is not limited to
        Boston in the 1970's and 1980's or an allegedly baseless
        claim by James Bulger. For example, an order from the U.S.
        District Court for the Central District of California has
        revealed the FBI lied to the court about the existence of
        records requested under the Freedom of Information Act
        (FOIA), taking the position that FOIA allows DOJ to
        withhold information from the court whenever it thinks this
        is in the interest of national security. Using the
        strongest possible language, the court disagreed: "The
        Government cannot, under any circumstance, affirmatively
        mislead the Court." Islamic Shura Council of S. California
        v. F.B.I., 779 F. Supp. 2d 1114, 1117 (C.D. Cal. 2011).

4.      The DOJ has repeatedly emphasized that their period of
        interaction with James Bulger was during the time when the
        LCN was the National Priority. The DOJ has historically
        taken liberty with the truth and attempted to justify their
        actions as defensible based on the mantra of national
        priority. In Islamic Shura Council of S. California v.
        F.B.I., the FBI also argued FOIA allows it to mislead the
        court where it believes revealing information would
        "compromise national security." Id. at 1121. The FBI also
        argued, that "its initial representations to the Court were
        not technically false" because although the information
        might have been "factually" responsive to the plaintiffs'
        FOIA request, it was "legally non-responsive." Id. at 1121,
        n.4 (emphasis added). The court noted, this "argument is
        indefensible," id. at 1121, and held, "the FOIA does not
        permit the government to withhold responsive information
        from the Court." Id. (quoting Islamic Shura Council of S.
        Cal. v. Fed Bureau of Investigation, 635 F.3d 1160, 1166
        (9th Cir. 2011)).

B.      **IT IS WELL KNOWN TO THE DEPARTMENT OF JUSTICE THAT JOHN
        CONNOLLY, FOR HIS OWN PERSONAL BENEFIT, CREATED A**

### "BULGER INFORMANT FILE" WITH FABRICATED INFORMATION AND INFORMATION STOLEN FROM OTHER SOURCES

*"It has been written that: The [FBI] employs two separate languages. The first, for internal and interdepartmental communications, may be called Bureau-speak. It is cryptic, telegraphic and routine and its purpose is less to communicate than to anticipate, to make a record for future protection." United States v. Salemme, 91 F. Supp. 2d 141, 204 n.33 (D. Mass. 1999) (quoting Victor S. Navasky, Kennedy Justice 8-9 (1968)).*

5.  John Connolly was stealing information from other agents' informant files and attributing it to Bulger to make it appear that Bulger was actually an informant. FBI agent Knotts complained to Assistant Special Agent in Charge Robert Fitzpatrick that John Connolly was stealing his 209 files giving James Bulger "credit". Robert Fitzpatrick, Betrayal 101 (2012); see also Fitzpatrick 302, 7/10/1998, at 00070946-47 (Knotts accused Connolly of stealing information that Knotts had received from his informants and crediting the information to his own informants).

6.  John Connolly needed to cover his illegitimate relationship with James Bulger by making it appear that the relationship was legitimate.

7.  John Morris testified that information from Stephen Flemmi was falsely attributed to James Bulger. Morris testified that Flemmi was "off the books" until 1980, and his assumption was that John Connolly would put Flemmi's information in James Bulger's file. Florida v. Connolly, 9/29/2008, 00267283. Morris also testified that he reported to the SAC that Flemmi was an informant and any information recorded had to be in Bulger's file Florida v. Connolly, 9/29/2008, 00267284-85.

8.  Assistant Special Agent in Charge Robert Fitzpatrick "thought a lot of [John Connolly's files] was what I would call self-serving and embellishing". United States v. Salemme, 4/17/1998, 00298118.

9.  Assistant Special Agent in Charge Robert Fitzpatrick met James Bulger once and concluded that "I felt we weren't getting what we were supposed to be getting." United States v. Salemme, 4/16/1998, 00297914.

10. John Connolly reportedly worked with at least sixteen informants and maybe in excess of twenty. Connolly worked and handled at least eleven of them during the relevant time frame. Connolly had an abundance of rumor, information and reports to draw from and falsely attribute to James Bulger. Memorandum from Connolly, 12/2/1980, 00274983-84.

11. Flemmi was not an authorized informant from the 1960's to 1980 but the FBI was receiving information, putting the information in reports, and putting into a file marked "Bulger". Morris feigns uncertainty when questioned about this improper practice. Florida v. Connolly, testimony of Morris, 9/29/2008, 00267285.

12. AUSA John Durham argues the same on May 8, 2002 in his opening statement of the United States v. Connolly trial:

> "You will hear about a very different kind of relationship, a personal relationship, a relationship in which the evidence will show bribes were paid to people, justice was obstructed, extortion was committed, reports were filed to the FBI by Mr. Connolly that were either full of misstatements or that omitted material pieces of information. . ."[8]

No. 99-10428 (D. Mass, May 8, 2002), Trial Tr. Day 2, 13:14-20.

13. AUSA Wyshak, prosecuting John Connolly in Florida state court, argued in his opening statement:

> "[n]ow, in order to support his decision to recruit James Bulger as an FBI informant, the defendant represented to his supervisors in the FBI that James Bulger, or Jim Bulger, could help them in this war on the mafia, or you may hear some witnesses call it La Cosa Nostra. The problem was Jim Bulger really couldn't help that much. He was an Irish guy from Southie, really didn't hang around in the [N]orth [E]nd with the Italian Mafia, principally hung around, but well get back to that a little later . . ." 9/15/2008, 00265029-30. ". . . its Stephen Flemmi who

---

[8] After unsuccessfully prosecuting John Connolly in Massachusetts federal court on many of the charges, the DOJ took the extraordinary step of directly participating in a prosecution in the state of Florida against Connolly on substantially the same charge, thereby getting a second opportunity to convict him.

really has got the information that the
defendant needs, but you will see that for
years, until about September of 1980, all the
documentation at the FBI and all the
information regarding the mafia or La Cosa
Nostra, is documented under Jim Bulger's
name." Id. at 00265045-46.

14. The DOJ's selective dissemination of information in
pleadings in the current case in an effort to promote their
public relations campaign is a tactic that will need to be
rebutted at trial. For example, the Government's March 1,
2013 statement to the Court takes offense to the fact that
Bulger was not an informant. The Government claimed "this
key 'fact,' . . . is completely contradicted by over 20
years of records and judicial opinions." Doc. 830, p. 2. In
an effort to convince the reader the Government pleads that
"as Bulger is no doubt aware, he had a unique FBI informant
number, and his informant file contains over 700 pages of
Bulger's informant reports, most of which were authored by
Bulger's corrupt former FBI handler, John Connolly." Doc.
830, p. 3. When making that statement to the public, the
prosecutors well knew about the above information, which is
only a fraction of the proof known to them and in their
possession, and they chose not to mention any of it in
their pleadings to this Court.

**C.   THE CONSISTENT RESPONSE OF FBI SUPERVISORS TO "CLOSE"
BULGER AFTER MEETING HIM IS PROOF THAT BULGER DID NOT
MEET AS AN INFORMANT AND THAT NO VIABLE INFORMATION WAS
EVER PROVIDED BY JAMES BULGER**

15. ASAC Robert Fitzpatrick met with James Bulger once.
Fitzpatrick determined that he wasn't satisfied with the
meeting. United States v. Salemme, 4/17/1998, 00298113.
Fitzpatrick didn't want to spend any more time trying to
get information from Bulger. Id. at 00298114. Fitzpatrick's
recommendation to close Bulger as an "informant" based on
Bulger's refusal to provide information was denied by his
superiors at the Boston Office and at FBI Headquarters.

16. SAC Sarhatt had much difficulty recalling his meeting with
James Bulger during his Salemme hearing testimony in 1998.
Sarhatt claimed he had no memory of where the meeting
occurred and claims he does not recall if it was at
Connolly's home, but Sarhatt sums it up his thought about
closing Bulger after one meeting as "I guess I was

concerned that he wasn't furnishing adequate information at the time, and there would be no worthwhile purpose of continuing him." United States v. Salemme, 1/7/1998, 00307914.

17. Ring can only remember his "observations" of meeting with Connolly and Bulger but claims he cannot recall the conversation. His "observations" resulted in Ring meeting with Connolly and reprimanding him for mistakes that Connolly was making, noting, "I was surprised at the conversation that was going on during the contacts." United States v. Salemme, 6/10/1998, 00306547. Ring was discontent because he believed "that we [FBI agents] should learn from [informants], and they should not learn from this, and that I'm surprised that I'm having a discussion like this with an experienced agent." Id. at 00306547.

18. Ring was under the impression that information was flowing the wrong way. Noting "[i]t wasn't anything important," he testified that "Mr. Bulger and Mr. Flemmi, they were studying me as much as I was studying them." United States v. Salemme, 6/10/1998, 00306548-49.

**D. THE ABSENCE OF ADHERENCE TO REQUIRED PROTOCOL FOR INFORMANT RELATIONSHIPS SUPPORTS THAT JAMES BULGER DID NOT HAVE AN INFORMANT RELATIONSHIP WITH THE DOJ**

*No DOJ required protocol was followed including fingerprinting and yearly signed acknowledgement of the informant relationship with the FBI. No supervisor, Special Agent in Charge or FBI employee from Headquarters ever raised a concern or comment about the absence of following DOJ guidelines despite the claim of yearly reviews.*

19. Not one agent, Boston supervisor, or Washington official conducting a "yearly review" ever took issue with the fact that there was no evidence of an acknowledged informant relationship between Bulger and the Department of Justice.

20. John Morris testified that, prior to John Connolly first introducing him to James Bulger, Connolly cautioned Morris "to treat him with respect. . . to not treat him like an informant." Florida v. Connolly, 9/26/2008, 00267228. Morris testified that the caution not to treat Bulger like an informant was a general ongoing conversation. United States v. Salemme, 4/21/1998, 00302998.

21. At Connolly's suggestion, they had this meeting at Morris' home. Only personal matters were discussed. . ." <u>Florida v. Connolly</u>, 9/26/2008, 00267228; <u>United States v. Salemme</u>, 4/21/1998, 00303071. Morris described the meeting as "just general conversation". <u>Id.</u> at 00303075. Morris described the meeting as "more social than anything." <u>Id.</u> Morris doesn't recall any real business that they were providing, any specific information. "I actually don't recall any details of the conversation." <u>Id.</u> Morris made no record of the meeting. <u>Id.</u>

### E. THE INFORMATION FALSELY ATTRIBUTED TO JAMES BULGER WAS NEVER VERIFIED

22. John Morris claims that he only met with James Bulger about 10 times and never prepared any documents of the meetings. <u>United States v. Salemme</u>, 4/21/1998, 00303105. In some of those meetings Morris has admitted that he provided James Bulger with intelligence, tips, and classified information.

23. John Morris testified that there was never a need to write a report after meeting with James Bulger because they never talked about anything substantive and it was always personal.  Other then cover pages or "inserts" the meetings were undocumented by Morris.  In consequence, John Morris contends that any alleged information provided by James Bulger was provided John Connolly. <u>United States v. Salemme</u>, 4/21/1998, 00303105-08.

24. John Morris did not believe that James Bulger even knew he was being labeled an informant and he didn't dare tell him he had a fabricated "informant number" or that there was a file with his name on it. John Morris did not have any conversation with James Bulger informing him that the FBI was falsely characterizing him as an informant. John Morris never had a conversation with James Bulger about being an informant. <u>United States v. Salemme</u>, 4/21/1998, 00303212, 00303214.

25. Despite the fact that James Bulger was not providing any information to John Morris, Morris falsely advised FBI Headquarters that Bulger was providing consistently excellent information. Morris furthered the lies and fabrications that were being presented by John Connolly by

endorsing Connolly documents such as "I concur with the observations and evaluations of SA Connolly and recommend continued contacts with [Bulger]." Morris addendum to Connolly memo, 12/2/1980, 00274984.

26. In 1980, Morris heralded that "[Bulger] was last rated as Excellent by the reviewing Inspector in 1976." Morris addendum to Connolly memo, 12/2/1980, 00274984. In 1998 after receiving immunity, however, Morris concedes that even though he added addendum that "reviewing inspectors" consistently rated information as very good" he never discussed the inspection or material with the inspector. United States v. Salemme, 4/22/1998, 00303162.

27. There is no information provided by the DOJ about the inspections of the file, who inspectors spoke with about the file, and whether they independently verified one fact in the entire file. The Government has produced no evidence of any DOJ reviews. If the Government is willing to identify these Washington inspectors the defense welcome an opportunity to subpoena them for trial.

28. It took cross-examination for John Morris to concede that information he claimed he heard from James Bulger did not actually come from James Bulger. Morris wrote that Bulger told him about the Winter Hill and LCN conflict. Morris conceded he "may not have personally received it, but was aware." United States v. Salemme, 4/22/1998, 00303165. He characterizes the misleading discrepancy as a "minor point". Id.

29. All management attempts to shirk their culpability by deflecting responsibility to Morris and ultimately John Connolly. The fallacy of this "rogue agent" promotion is transparent. SAC Sarhatt was asked if he recalled any reviews that were sent from the Boston FBI office to FBI Headquarters. United States v. Salemme, 1/9/1998, 00307914-15. He was asked whose responsibility it was generally to prepare those reviews. He responded, "I want to say either the supervisor or the assistant supervisor in charge ... who was in charge of that squad or group of squads." Id. at 00307915. And when asked, "And in the case of Mr. Flemmi and Mr. Bulger, that would have been John Morris, is that correct?" Sarhatt answered "yes." Id.

30. SAC Sarhatt continues to insulate himself by trying to disown his initials on documents that were sent to FBI

Headquarters. When asked "Morris had permission to send communications to the FBI Headquarters in Washington, DC with your initials on it even if you didn't see a document; is that your testimony?  Sarhatt answered "That's right." United States v. Salemme, 1/7/1998, 00307931. Pg.77 "Q. So, Mr. Morris would have had authority when you were Special Agent in Charge to reopen an informant and communicate that fact to the Bureau Headquarters? A. "Right. All the supervisors do." Id. at 00307931.

31.  SAC Greenleaf denounced his knowledge and responsibility as well, claiming that he deferred all details to his subordinates. When asked about his supervisory involvement in James Bulger, SAC Greenleaf testified "[a]gain, in the office, I didn't get into that kind of detail on the cases. I left it up to the case agents and to the supervisors to deal with those kinds of issues." United States v. Salemme, 1/8/1998, 00300719-20. Further, when asked if "during your three plus years as Special Agent in Charge, an enormous amount of responsibility for the day-to-day or week-to-week communication with informants was delegated by you through the hierarchy to Special Agent Connolly", Greenleaf's answer was "Yes. . . And the supervisors." Greenleaf confirmed the supervisors "were Morris and then Special Agent Ring". Id. at 00300742.

32.  James Ring attempts to disavow knowledge of meetings with Bulger which confirms that Bulger was not providing information. In the Salemme hearing, Ring was asked if he remember the first meeting he had with Bulger and Ring responds "Not particularly." United States v. Salemme, 9/10/1998, 00306539.  When asked if he remember what was discussed at the first meeting, which Ring believes was at John Connolly's apartment, Ring responds "no sir." Id. at 00306541-42. Ring also cannot "remember" how long the meeting lasted. Id. at 00306543.

33.  After describing a meeting that consisted of Bulger complaining about DEA bugs in his car, Ring is asked if he remembers any other conversation he had with Mr. Bulger. Ring responded he did not "not without being refreshed, I don't, no." United States v. Salemme, 6/10/1998, 00306584-85.

34.  When asked if Ring recalls that Bulger had provided information that Mercurio was going to flee before going to prison again, Ring admits that only Connolly said that

Bulger said that. <u>United States v. Salemme</u>, 6/8/1998, 00306315.

**F.    THE DEPARTMENT OF JUSTICE PROVIDED EMPLOYEES LIKE JOHN
        CONNOLLY INCENTIVE TO LIE ABOUT THEIR RELATIONSHIPS WITH
        ORANIZED CRIME FIGURES**

*It was important to an agent because to have a person
designated as a TE "that's reflective of his work and the
caliber of informants that he's operating, and that's a
measure and sense of his productivity and his value to the
organization."* <u>United States v. Salemme</u>, **testimony of
Morris, 4/22/1998,** *00303222.*

35.  Connolly's numerous superiors and various directors in the
     FBI repeatedly endorsed his actions and recommended him for
     increases in salary and monetary awards. Letter from
     Director Sessions to Connolly, 10/5/1990, 00086338. Memo
     from SAC, Boston to Director, FBI, 3/22/1983; Letter from
     Director Sessions to Connolly, 10/5/1990, 00086338; Letter
     from Director Sessions to Connolly, 3/17/1988, 00086281;
     Connolly Performance Evaluation, 11/12/1982, 00126537.

36.  Connolly was recommended for salary increases, monetary
     awards and promotions based on his excellence in handling
     informants. Letter from Director Sessions to Connolly,
     10/5/1990, 00086338; Letter from Director Sessions to
     Connolly, 3/17/1988, 00086281.

37.  In 1982, Morris vouched: "His performance has been at the
     level to which all should aspire to attain but few will
     realistically reach."  Connolly Performance Evaluation,
     11/12/1982, 00126537.

**G.    THE DOJ DID NOT DOCUMENT EVIDENCE OF THE TRUE NATURE OF
        THEIR RELATIONSHIP WITH JAMES BULGER**

38.  Despite the fact that FBI procedures require that all
     contacts with "informants" be documented, there was only
     one, a 1979 report reflecting matters discussed at the
     numerous private dinners attended by James Bulger and
     members of the DOJ.

39.  There was no record of the gifts or money exchanged. There
     was no record of classified information being provided to

Bulger. There was no record of the steps the DOJ went to in refraining in prosecuting Bulger for twenty-five years.

40.   John Morris claims that he and John Connolly told Jeremiah O'Sullivan that James Bulger was an informant. United States v. Salemme, 4/21/1998, 00303126; Morris 302, 12/16/1997, 00070237. This claim is wholly unsupported in the Department of Justice records.  When asked to explain why the alleged conversation was not documented, Morris claimed that since the conversation would be unauthorized he deliberately did not document it. United States v. Salemme, 4/21/1998, 00303126; Morris 302, 12/16/1997, 00070237. This calls into question the truth of the alleged conversation. It also emphasizes that Morris supports the proposition that agreements, interaction, and conduct not in compliance with rules would be hidden in order to avoid scrutiny. The trumpeting that there is no "signed" immunity agreement is put into proper perspective when learning that DOJ employees routinely and selectively chose to refrain from documentation if it suited their purpose. Morris 302, 12/16/1997, 00070237.

41.   Morris was involved in the Bahorian wiretap and indictments. United States v. Salemme, 4/22/1998, 00303246-47. Morris attended a meeting that Bulger was present for at Morris' townhouse in Lexington. Id. at 00303248. Morris warned Flemmi to stay away from Bahorian. Id. at 00303250. Morris knew it was unlawful, and could have been construed as obstruction of justice. Id. at 00303250.  This crime was not recorded in any report by Morris.

   **H.   THE CLAIM THAT BULGER ASSISTED IN PRINCE STREET WIRETAPS AND WAR AGAINST LA COSA NOSTRA IS UNTRUE**

42.   Claiming that James Bulger "was crucial" or had any involvement in "taking down the Italians" or assisting in the Prince Street wiretaps is pure bromide adopted by the Government to support revisionist history. Jeremiah O'Sullivan testified that Bulger was not crucial at all to the Prince Street wiretap. O'Sullivan Dep. Aug. 30, 2004, 76:9-16; O'Sullivan 302, 3/27/2000, 00070524. O'Sullivan said the same before the congressional hearing. O'Sullivan Congressional Hearing Testimony at 317.

43.   O'Sullivan admitted that he had met a "critical informant" that provided most of the probable cause for the Angiulo

tap. O'Sullivan 302, 3/27/2000, 00070524. O'Sullivan
believed that the other source could have provided same
information as Flemmi. O'Sullivan 302, 3/27/2000, 00070524.

44. Notably, any diagrams of LCN locations or any other
diagrams ever provided to law enforcement were exclusively
by Stephen Flemmi's hand. E.g., United States v. Salemme,
Ring testimony, 6/11/1998, 00306784-85.

45. Morris and Connolly continued this façade for their own
personal gain. Morris falsely authored reports, adding the
following addendum to a memorandum written by John
Connolly:

> "[Bulger] is one of the most highly placed and
> valuable informants in the Boston Division. [He] was
> last rated as Excellent by the reviewing Inspector in
> 1976. The closing of an informant of this caliber
> would deal a serious blow to the [Organized Crime
> Program] of the Boston Division." 12/2/80
> Justification memo, 00274984.

46. FBI Agent Sarhatt wrote a memo which indicated that
O'Sullivan urged him to keep Bulger as an informant; Bulger
was crucial, "as the information he [Bulger] is currently
furnishing is crucial to the Title III application of LCN
members in Boston. . ." 12/1/80 Sarhatt Memo, 00139504.

Knowing this information to be false Connolly and Morris,
in another memorandum dated April 1, 1981, strongly urged
that Bulger be continued as an informant based on his
invaluable contributions to the bugging of 98 Prince Street
and 51 North Margin Street and his potential to assist in
the development of cases those tapes might generate. Morris
wrote:

"One of these two cases [98 Prince Street] . . . has been
characterized by FBIHQ officials as one of the most
important and successful Title III's conducted by the FBI
in the past ten years." 4/1/1981, 00285564.

47.  While Flemmi may have provided information to the federal
government, James Bulger did not.  There is no credible
evidence to support such a proposition.

**J.   MORRIS UNWILLINGLY SUPPORTS THE TRUTH THAT JAMES
         BULGER WAS NOT AN INFORMANT**

48.   When questioned about his lies to officials about the
      Lancaster Street tip, Morris testified that he may have
      lied to protect himself. "[Bulger and others were] angry
      and absolutely stunned that I would have taken information
      that they had provided relative to their knowledge of
      Lancaster Street Garage, whatever was going on, and pass
      that back on to other authorities. . . . It's very clear to
      me that my thinking wasn't very clear, and I wasn't very
      rational." United States v. Salemme, 4/23/1998, 00303365-
      66. DOJ officials responsible for protecting Bulger shift
      the blame on to one another and attempt to reassign
      responsibility away from themselves. For example, SAC
      Sarhatt, who failed to review or verify any alleged
      information in the Bulger file, maintained that he wanted
      to close Bulger as an unproductive informant but that
      Jeremiah O'Sullivan wanted the FBI to continue to protect
      James Bulger. Sarhatt Memo, 12/1/1980, 00139504.

**ARGUMENT**

**I.   Renewed Request for DOJ Correspondences and
Communications**

"Sunlight is said to be the best of disinfectants."[9] If

there is any single lesson to be taken from the decades-long

misconduct involving the Department of Justice and organized

crime in Boston it is that Government secrecy breeds Government

corruption. Some insight into the DOJ's malfeasance was exposed

only by the powerful light of transparency, shined upon the DOJ

by the federal courts, Congress and a public hunger for the

truth. The Government resisted this quest for truth every step

of the way. Had the decision belonged to the Government, a veil

---

[9] Justice Louis D. Brandeis.

of secrecy would have forever hidden the shameful conduct of the Justice Department and its employees.

Since the inception of this case, James Bulger has sought transparency. He has fought for access to information vital to his defense. The Government has resisted him at every turn. The defendant moved for access to DOJ documentation to support many of the points outlined in the supporting motion above.  It is imperative that the defendant be allowed to determine the extent of the higher level DOJ employees and knowledge about the arrangements between the DOJ and James Bulger

The United States Attorney's Office has maintained that they do not have access to Department of Justice records unless the Department has given them records. In consequence, the United States Attorney's Office only has access to a portion of the Department's records and is provided access to records on an as needed basis. The United States Attorney's Office position that they are "separate" from the Department ensures that the USAO cannot assure the Court that Department records were adequately reviewed or provided. James Bulger's immunity agreement is with the DOJ not the United States Attorney's Office. Without access to DOJ records it is impossible to obtain relevant evidence that provide support that the DOJ granted James Bulger immunity.

Despite this opposition to any meaningful discovery of the

DOJ's internal practices and communications, the Government has now put these very issues at center stage in the form of the Margolis Affidavit. This is consistent with the Government's ongoing pattern of selective disclosure, a position that is best described as "trust us". For example, when the defendant initially moved for disclosure of DOJ materials, the Government emphasized that "*relevant* Government documents have been reviewed by at least three different teams of *Government* lawyers and investigators." (Doc. 785 at 8)(emphasis added). It was, they claimed, "pure fantasy for the defendant to contend that Government documents exist that support his immunity claim which have yet to be discovered by the aforementioned teams of prosecutors and investigators." Id. In other words, the defendant must trust the Government - including the same prosecutors and investigators that are currently pursuing his conviction – to determine what is relevant to his defense.

The Margolis Affidavit is the most recent example of the Government's "trust us" position on discovery. Margolis avers that he has no knowledge of Jeremiah O'Sullivan requesting immunity for the defendant yet acknowledges that O'Sullivan "reported to me most often through one of my deputy chiefs assigned to supervise the Boston Strike Force." (Margolis Aff., ¶ 2). The Government offers Margolis as the final authority on whether O'Sullivan sought authorization but he cannot state with

any certainty whether O'Sullivan had any such conversations with other supervisors in the DOJ: "Furthermore, *as far as I know*, O'Sullivan never discussed the issue of immunity or non-prosecution for James Bulger with any of my deputies." (Margolis Aff., ¶ 6)(emphasis added).

This problem is compounded by the Government's refusal to provide any names of the DOJ attorneys who served in relevant positions at the time.[10] The Government would prefer to have Margolis speak on behalf of these unidentified deputies while denying the defendant his right to conduct his own investigation. The existence of any correspondences between O'Sullivan and his superiors prevents the defense, and the public, from learning the extent of knowledge by upper level employees of the DOJ.

The "trust us" approach is pushed to an absurd extreme in the final paragraph of the Margolis Affidavit: "I am advised that a thorough search of the records of the DOJ and the FBI disclosed no documentation that James Bulger was ever actually authorized to engage in any criminal activity." (Margolis Aff., ¶ 9). Margolis does not identify who "advised" him nor does he elaborate on these individuals' basis of knowledge. The Government merely submits this hearsay-based conclusion without any context or detail. The defendant must now trust not only

---

[10] See Section II below.

Margolis; he must trust anonymous employees of the Justice
Department to correctly identify for him evidence favorable to
his defense. This Kafkaesque arrangement does nothing to protect
his constitutional right to exculpatory and material evidence
and the right to a fair trial. The Government's intent is clear:
deny the defendant access to DOJ's internal documents and
selectively disclose only that information which is favorable to
their case. The Government therefore relies upon the conclusory
opinions of Mr. Margolis while denying the defendant the
information needed to investigate these claims and respond
adequately.

James Bulger does not trust the DOJ to select for him the
evidence that he may use in his defense, whether at trial or at
a pretrial hearing. Circumstantial evidence corroborating the
grant of immunity must be disclosed to the defense yet its
probative value may not be obvious to someone who is skeptical
towards the defendant's claim of immunity. Judge Stearns only
required the Government to disclose DOJ correspondences that
specifically reflected the existence of an immunity agreement.
This ruling takes an unduly narrow view of the Government's
obligations under Brady v. Maryland, 373 U.S. 83 (1963). The
scope of the Government's Brady obligations is not limited to a
mere search for the word "immunity". Yet this seems to be the

Government's position.[11] Judge Stearns' December 6, 2012 ruling
appears to adopt this reasoning without explanation. Both the
Government and the court overlooked the exculpatory nature of
circumstantial evidence that corroborates immunity. The
Government obtains convictions based upon circumstantial
evidence on a daily basis. A defendant is no less entitled to
rely upon such evidence to support his defense. Here, evidence
of favorable treatment or a refusal to prosecute the defendant
strongly supports the defendant's claim of immunity. It does not
matter that the Government offers a different interpretation
(e.g. prosecutorial discretion). If an item is *arguably*
consistent with the existence of an immunity agreement, it is
exculpatory and must be disclosed.

The 1979 race-fixing case is a glaring example of
O'Sullivan declining to prosecute the defendant despite having
sufficient evidence to do so. This inexplicable decision
strongly supports the defendant's immunity claim. Documents
indicating O'Sullivan's reasons for not prosecuting the

---

[11] The Government adopted a similar position before Judge Mark Wolf during the
Salemme hearings. During oral argument, the prosecutor made the troubling
argument that any document other than one where Jeremiah O'Sullivan
explicitly recognized an immunity agreement would not be discoverable under
Brady. "[A]ny document short of that reflecting a decision by the Government
whether or not to prosecute people based upon an exercise of prosecutorial
discretion has nothing to do with Mr. Flemmi's immunity and doesn't support
his immunity claim and is not exculpatory." United States v. Frances Salemme,
et al., Crim No. 94-10287-MLW, (D. Mass., April 21, 1998, p. 172)(Bates
#00303139). The court rejected this argument and ordered the Government to
produce anything in the Government's possession that was arguably consistent
with Flemmi's claim of immunity. Id. at 177 (Bates #00303144).

defendant are highly relevant. It defies logic that there is no documentation of the decision to forgo prosecution of someone of the defendant's notoriety. In fact, the United States Attorneys' Manual requires prosecutors to record the reasons for declining to prosecute.[12] The Government has never provided any DOJ memoranda or correspondences from O'Sullivan or any other attorney explaining why the defendant was not charged.

With the filing of the affidavit, the Government has asserted that O'Sullivan never discussed immunity with his superiors. In doing so, the Government has thrown the door wide open to an inquiry into this very question. The Government cannot argue that the defendant's immunity claim must fail because *one person*, David Margolis, was unaware of any such agreement while at the same time arguing that it is irrelevant whether O'Sullivan was discussing the defendant's case with other attorneys in the DOJ.

In its opposition to the defendant's November 2 discovery motion, the Government relied heavily on the deliberative process privilege. (Doc. 785 at 24-25). That privilege is not absolute. Texaco Puerto Rico v. Department of Consumer Affairs,

---

[12] "Whenever the attorney for the Government declines to commence or recommend Federal prosecution, he/she should ensure that his/her decision and the reasons therefore are communicated to the investigating agency involved and to any other interested agency, and are reflected in the office files." United States Attorneys' Manual, § 9-27.270(A), available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/27mcrm.htm#9-27.270.

60 F.3d 867, 885 (1st Cir. 1995). The privilege is a
discretionary one requiring the court to consider "the interests
of the litigants, society's interest in the accuracy and
integrity of factfinding, and the public's interest in honest,
effective Government." Id. "[W]here the documents sought may
shed light on alleged Government malfeasance, the privilege is
routinely denied." Id. (quoting In re Franklin Nat'l Bank Sec.
Litig., 478 F. Supp. 577, 582 (E.D.N.Y. 1979)).  Here, the
factors weigh in favor of disclosure. There is a compelling
public interest in uncovering the truth of these matters. Any
deliberative material is decades-old and likely pertains to
long-closed investigations. The Government has no legitimate
interest against disclosure, only to avoid potential
embarrassment and to gain a tactical advantage over the
defendant. These are not sufficient justifications to withhold
from the defendant potentially exculpatory evidence. To the
extent that there is any credence to the exercise of this
privilege, the court may in its discretion review the materials
in camera.

The Government has also asserted that the work-product
privilege barred disclosure of the requested documents. (Doc.
785 at 23-24). It is difficult to imagine that *every* DOJ
communication about the defendant and his cohorts would have
been drafted in contemplation of litigation. In fact, the

44

defendant is most interested in communications explaining the *absence* of litigation, i.e. why he was never charged with a crime. If any such documents exist, they would not be privileged. The Government's blanket assertion of attorney-work product must be examined more critically. The court should require the Government to assert the privilege with some specificity. If necessary, the court should conduct its own *in camera* review as to whether the privilege applies. Otherwise, the defendant will once again be forced to trust the Government to provide evidence relevant to his defense.

## II.  Request for Disclosure of DOJ Attorneys' Names and Dates of Service

The defendant moves for the names and dates of service for Department of Justice attorneys assigned to the Strike Force from 1972 to 1994, Chiefs of the Criminal Division from 1972 to 1994, Chiefs of the General Crimes Section from 1972 to 1994 and the Special Agents in Charge of the Drug Enforcement Administration from 1972 to 1994. As required by Local Rule 116.3, the defendant made a written request to the Government for these items on January 31, 2013. The Government denied the request in writing on February 21, 2013 and again during a conference call on March 6, 2013.

The defendant is entitled to discovery of items that are "material to preparing the defense".  Fed. R. Crim. P. 16

(a)(1)(E)(i). Rule 16 has been used to compel the production of evidence that is significant to the defense, but is not necessarily exculpatory. See United States v. Pesaturo, 519 F. Supp. 2d 177, 191-92 (D. Mass. 2007). The defendant must support his request for the documents he is seeking with a "prima facie showing of materiality." United States v. Carrasquillo-Plaza, 873 F.2d 10, 12 (1st Cir. 1989) (quoting United States v. Buckley, 586 F.2d 498, 506 (5th Cir. 1978)). "This materiality standard normally is not a heavy burden." United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993) (quoting United States v. George, 992 F.2d 348, (D.C. Cir. 1993)). "[E]vidence is material as long as there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" Id.

## Request for Oral Argument

The defendant requests oral argument on this motion.

## Conclusion

For the foregoing reasons, the defendant moves that this Court order the Government to produce the above-referenced items of discovery.

## Local Rule 116.3(f) Certification

Counsel for the defendant certifies that this motion was filed in compliance with Local Rule 116.3(f). After discovery

letters were exchanged pursuant to Local Rule 116.3(e), counsel

for the defendant and the government conferred with each other

but were unable to resolve the issue.

                              JAMES J. BULGER
                              By His Attorneys,


                              CARNEY & BASSIL

                              *J. W. Carney, Jr.*
                              J. W. Carney, Jr.
                              B.B.O. # 074760

                              *Henry B. Brennan*
                              Henry B. Brennan
                              B.B.O. # 634036

                              Carney & Bassil
                              20 Park Plaza, Suite 1405
                              Boston, MA 02116
                              617-338-5566


Dated: March 25, 2013


                       Certificate of Service

     I hereby certify that this document filed through the ECF system will
be sent electronically to the registered participants as identified on the
Notice of Electronic Filing (NEF) and paper copies will be sent to those
indicated as non-registered participants on or before the above date.

                              *J. W. Carney, Jr.*
                              J. W. Carney, Jr.