```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,

 5                   Plaintiff,          Criminal Action
                                         No. 99-10371-DJC
 6   V.
                                         August 2, 2013
 7   JAMES J. BULGER,                     8:47 a.m.

 8                   Defendant.
     _____
 9

10

11              TRANSCRIPT OF JURY TRIAL DAY 35

12          BEFORE THE HONORABLE DENISE J. CASPER

13             UNITED STATES DISTRICT COURT

14           JOHN J. MOAKLEY U.S. COURTHOUSE

15                    1 COURTHOUSE WAY

16                   BOSTON, MA  02210

17

18

19

20               DEBRA M. JOYCE, RMR, CRR
                 LEE A. MARZILLI, RMR, CRR
21                Official Court Reporters
             John J. Moakley U.S. Courthouse
22             1 Courthouse Way, Room 5204
                   Boston, MA  02210
23                  617-737-4410

24

25
```

```
1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    BRIAN T. KELLY, ESQ.
     FRED M. WYSHAK, JR., ESQ.
4    ZACHARY R. HAFER, ESQ.
     MARY B. MURRANE, ESQ.
5    United States Attorney's Office
     John Joseph Moakley Federal Courthouse
6    1 Courthouse Way
     Suite 9200
7    Boston, MA 02210
     617-748-3197
8
     FOR THE DEFENDANT:
9
     J.W. CARNEY, JR., ESQ.
10   HENRY B. BRENNAN, ESQ.
     Carney & Bassil
11   20 Park Plaza
     Suite 1405
12   Boston, MA 02116
     617-338-5566
13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2          (The following proceedings were held in open

3    court before the Honorable Denise J. Casper, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on August 2, 2013.)

7          THE COURT:  Good morning.

8          ALL:  Good morning.

9          THE COURT:  Good morning, counsel.

08:47 10          Good morning, Mr. Bulger, good morning counsel.

11          THE DEFENDANT:  Good morning, your Honor.

12          THE COURT:  Counsel, before we begin, is there

13    anything we need to address before we begin?

14          MR. KELLY:  The matter is not resolved, your Honor,

15    but the parties are working on resolving any forfeiture issues

16    so perhaps it does not even need to go to the jury, and in the

17    ordinary course it would go to the Court.  We're still

18    discussing procedurally how that would work.

19          THE COURT:  Okay.

08:47 20          Counsel, I was going to inquire about that today, but

21    I'll leave it to counsel to discuss, and I may ask you about it

22    at the end of the day.

23          Counsel, just a few matters on the jury charge.

24          The first, Mr. Carney, having gone back to look at the

25    Commonwealth v. Deane case that I mentioned yesterday, and upon

1    further reflection, for all the reasons that I stated

2    yesterday, I'm not going to give the accessory after the fact

3    instruction, that was Docket 1244.  So that motion is denied,

4    again, for the reasons I stated on the record yesterday.

5         In regard to the request by the government to give

6    some instruction on Rule 35, Ms. Hourihan just handed you a

7    proposed instruction which both addresses what I think

8    Mr. Carney's concern was, but also tracks the language of Rule

9    35.  My intention would be to insert this after page 16 of the

08:48 10   charge, which is the instruction about caution as to certain

11   witnesses.

12        So I think in that context and given the substance of

13   this instruction, I think it's appropriate for reasons that

14   I've alluded to on the record to give this instruction.

15        Counsel, I had given you my thoughts on it being in

16   the Court's discretion about whether the $822,000 go back to

17   the jury or not.  Has there been any discussion among the

18   parties about that?

19        MR. HAFER:  Your Honor, I think to the extent we can

08:49 20   reach resolution on the forfeiture issue, it will also cover --

21        THE COURT:  So I'll wait until counsel raises that

22   again.  I'll probably check in with you about it at the end of

23   today.

24        MR. CARNEY:  I can alert your Honor what the focus of

25   the discussions is.

1          THE COURT:  Okay.

2          MR. CARNEY:  My client is prepared to have all of the

3    money forfeited, provided it goes to the victims' families who

4    prevailed at trial with a judgment but had that judgment

5    reversed by the 1st Circuit Court of Appeals because of a

6    highly technical application of a statute of limitations for

7    bringing a civil case.

8          THE COURT:  Okay.

9          Well, counsel, we can talk about it --

08:50 10          MR. CARNEY:  So we've begun talking about that, and if

11   the money can go to those folks who had their winning judgment

12   taken away by the 1st Circuit, then the forfeiture issue

13   concerning the money will not have to go to the jury.

14          If that can be agreed upon, it may -- it would make it

15   more likely that the firearms one would be resolved as well,

16   and then all that would remain would be personal effects that

17   were found in the apartment.

18          THE COURT:  Okay.

19          MR. KELLY:  And we are trying to resolve that, your

08:51 20   Honor.  It's always been our intention to seek to have all the

21   assets and funds returned to the innocent victims, but we're

22   not sure that Mr. Carney or his client can dictate which ones

23   can get it.  So we have to discuss it further and perhaps we

24   can resolve this, hopefully, by today.

25          THE COURT:  It's obvious the Court would prefer an

1   answer, depending on where we are, by the end of today.  We'll

2   see where we go today.  I'll bring it up at the end of today.

3          MR. CARNEY:  I suspect --

4          THE COURT:  Just give me one --

5          Okay, counsel.

6          MR. CARNEY:  I suspect that Mr. Kelly and I will be

7   meeting with the people with true expertise in this area to see

8   how it can get done, but it seems like if the parties are this

9   close, we should be able to reach agreement.

08:51 10          THE COURT:  Okay.

11          Counsel, just in regards to Mrs. Hussey's, Mrs. Marion

12   Hussey's testimony, how are you proposing that be introduced?

13          MR. CARNEY:  I would just read it.

14          THE COURT:  Okay.

15          Counsel --

16          MR. CARNEY:  I will offer a copy for the record --

17          THE COURT:  Okay.

18          MR. CARNEY:  -- as an exhibit, but then when it comes

19   time for publishing, since they're both so brief and it can be

08:52 20   difficult to read this type of document on the screen, I'll ask

21   permission to just read it.  It will probably take two minutes.

22          THE COURT:  Okay.

23          And, counsel, as I said before, when you get to the

24   end of the named defense witnesses, you'll approach sidebar.

25          MR. CARNEY:  I think what would be the better approach

```
 1   and the one that I would request, your Honor, is if the Court
 2   could take a brief recess.
 3             THE COURT:  Yes, meaning either way, it will be
 4   outside of the presence of the jury, so that's fine.
 5             MR. CARNEY:  As your Honor probably knows, there's a
 6   room behind your courtroom where counsel can speak
 7   confidentially with the client, so it's not a matter of his
 8   having to go downstairs.  We can speak to him up here, and be
 9   ready to report to the Court as soon as we can.
10             THE COURT:  Okay.
11             Okay.
12             Counsel, anything else?
13             MR. WYSHAK:  There is one outstanding exhibit, your
14   Honor, 1500.  I offered it through Fred Davis, it was admitted
15   conditionally.  We gave a copy to Mr. Brennan.
16             THE COURT:  And I think, Mr. Brennan, your objection
17   was limited as to the time frame in which it was in effect, but
18   I think there was testimony about that.
19             MR. BRENNAN:  I wanted to read the exhibit before I
20   agreed to it.
21             I have read it, and based on the witness' testimony, I
22   don't believe he endorses that as the actual rule and
23   regulation.  While he generally said there were rules and
24   regulations, he had a very vague familiarity with the actual
25   regulations, and I can't say that the testimony supports the
```

1   endorsement of the regulation that the government wants to

2   admit.

3          So I think that the Court should not admit that

4   regulation.  What it is, it's just a piece of a regulation

5   pertaining to a particular issue, and I can understand that it

6   may have been or may not have been in effect at a particular

7   time, but it has no relevance where this witness couldn't fully

8   endorse that as a regulation that existed and that he knew

9   about and that he followed.

08:54 10       So I think his testimony really is the strength of the

11  process and the procedure in which these files were accessed or

12  held confidential rather than have a regulation say it.  The

13  regulation has little meaning if the people involved didn't

14  actually acknowledge it or follow it.

15         MR. WYSHAK:  I think Mr. Brennan's view of the

16  witness' testimony is a little skewed, your Honor.

17         THE COURT:  Well, counsel, can you do this for me --

18  because I actually have not seen the exhibit myself -- do you

19  have an extra copy or can you get an extra copy?

08:55 20       MR. WYSHAK:  I can hand up the copy I have.

21         (Pause.)

22         THE COURT:  And, Mr. Wyshak, your position is the

23  foundation was laid for the admission of this document?

24         MR. WYSHAK:  Yes.  This document refers to an issue

25  which I think the defense has been contesting throughout the

1    trial, which is, you know, the accessibility of informant files

2    by line agents; and that document clearly reflects that as of

3    1978, all FBI offices were instructed to create an informant

4    file room which was to be locked and managed by the informant

5    coordinator.

6            And I think Mr. Davis testified he got there in 1979

7    and, in fact, all the informant files were kept and maintained

8    in that informant file room.  There was a clerk who worked in

9    the file room.  There were certain procedures about having

08:56 10   access to informant files.  An agent could only take out his

11   particular file.  If he wanted to access somebody else's

12   informant file, he had to go through a supervisor.

13           So I think, you know, just in terms of the process, I

14   think this is a document that he identified as an FBI document

15   on the particular subject matter that he was actually called by

16   the defense to testify about.

17           THE COURT:  And it's admission as a business record,

18   counsel?

19           MR. WYSHAK:  Yes, this is -- you know, on the business

08:57 20   record issue, even law enforcement agencies keep and maintain

21   business records.  Not every record kept and maintained by a

22   law enforcement agency contains the kind of hearsay, for

23   example, in an interview report, that might be objectionable.

24           THE COURT:  I agree that this is a different type of

25   document, counsel.

 1          MR. WYSHAK:  Yes.

 2          THE COURT:  Okay.

 3      Mr. Brennan.

 4          MR. BRENNAN:  I'm not troubled by the authenticity of

 5  the document, it's the admissibility of it.

 6          Simply because there's a rule in the Boston FBI,

 7  doesn't mean that the Boston FBI agents or their superiors

 8  followed it.

 9          THE COURT:  Well --

08:57 10          MR. BRENNAN:  So to interpose a rule and say, This is

11  how things were done, and make the suggestion or inference that

12  this the procedure that people followed is misleading.  We know

13  from the agent they didn't follow the rules, that's half the

14  reason why we're here today.

15          THE COURT:  Counsel, you still have that argument

16  about whether or not it was followed.  I don't see how that

17  affects admissibility.  Meaning my memory is that Mr. Davis

18  testified that when he arrived in the Boston office, there was,

19  even if it hadn't existed before, there was now this policy in

08:58 20  regards to the confidential file room.  And he certainly

21  testified about the existence of this space.

22          MR. BRENNAN:  I don't contest that there was an

23  existence of rules, but the only inference that the government

24  would be able to draw from that that has any relevance is to

25  say, This is the rule, this is what agents did.  There is no

1    evidence to support that is what agents did; in fact, to the

2    contrary, agents didn't follow these rules.  There's been a

3    number of witnesses who have testified about the procedure and

4    the method that agents took to circumvent these rules.

5         So having a rule put in front of the jury has no

6    relevance unless the rule was followed.  So it's hard to

7    imagine the inference that a jury could take from the rule

8    that's been broken many, many times.  They have it in writing,

9    it says only that the Department of Justice wanted them to

08:59 10   follow a particular course of action, but the testimony is

11   otherwise.  The testimony is that agents didn't follow a

12   particular course of action.  I really don't see any relevance

13   of putting a rule in front of the jury that wasn't followed.

14        THE COURT:  Well, counsel, I think policies and

15   procedures get put in front of juries all the time, whether or

16   not they were followed.  So I'm not sure that that's a basis

17   for not admitting this.

18        I want to take a moment to go back and look at

19   Mr. Davis' testimony, but I'll get back to you before the end

08:59 20   of the morning about this.

21        MR. BRENNAN:  Thank you.

22        THE COURT:  Counsel, why don't we check if all the

23   jurors are here.

24        Thank you.

25        THE CLERK:  All rise.

```
 1              (Recess taken.)

 2              (Jury entered the courtroom.)

 3         THE COURT:  Good morning, jurors.

 4         THE JURY:  Good morning.

 5         THE COURT:  We'll get started.

 6         Mr. Carney?

 7         MR. CARNEY:  Yes, I call Ms. Sideropoulos, please.

 8         THE COURT:  She may be called.

 9         DESI SIDEROPOULOS, having been duly sworn by the

09:06 10  Clerk, was examined and testified as follows:

11         THE CLERK:  Thank you.  Please be seated.

12         THE COURT:  Good morning.

13         THE WITNESS:  Hi.

14         THE COURT:  Mr. Carney.

15         MR. CARNEY:  Thank you, your Honor.

16                    DIRECT EXAMINATION

17  BY MR. CARNEY:

18  Q.    Good morning.

19  A.    Good morning.

09:06 20  Q.    I'm over here.

21  A.    Which way?

22  Q.    Right here.

23         (Laughter.)

24  Q.    The voice from above.

25         (Laughter.)
```

1    Q.   Could you please introduce yourself to the members of the

2    jury, and make sure that that microphone is close enough to you

3    so they can hear you?

4    A.   Okay.

5         My name is Desi Sideropoulos, and I'm secretary to the

6    Special Agent in Charge of the FBI in Boston.

7    Q.   Are you over the age of 50?

8    A.   Yeah -- yes.

9         (Laughter.)

09:07 10   Q.   And you're currently the Chief Assistant to the Special

11   Agent in Charge; is that correct?

12   A.   Yes.

13   Q.   Please tell the members of the jury how long you have

14   worked for the FBI in Boston.

15   A.   Sixty-two-and-a-half years.

16   Q.   How long have you been the Chief Assistant to the

17   individual who is in charge of the Boston office?

18        How many of those years?

19   A.   Fifty-and-a-half.

09:07 20   Q.   So 50-and-a-half years you've been the personal secretary

21   for the person in charge of the Boston office?

22   A.   Well, initially we had two secretaries.  I was the

23   assistant, and then after the -- you know, the real one.

24   Q.   And after he or she left --

25   A.   Yeah.

```
 1   Q.    -- did you become the chief?

 2   A.    Yes.

 3   Q.    Now, what is the name called of the person who is in

 4   charge of the Boston office, the title?

 5   A.    Special Agent in Charge.

 6   Q.    Approximately how many Special Agents in Charge do you

 7   think you have worked under in your time at the Bureau?

 8   A.    I've worked under 18, the new one that just arrived.

 9   Q.    That's --

10   A.    No, no, he's the 18th.

11   Q.    He's the 18th person.

12   A.    Yes.

13   Q.    What are your duties for the Special Agent in Charge?

14   What are your job responsibilities?

15   A.    Personnel -- well, I do whatever he asks me to do, what an

16   executive secretary does.

17   Q.    Can you tell us, please, if you do any preparing of

18   documents for the SAC?

19   A.    Well, I take dictation.

20   Q.    Is that the formal process in the FBI?

21   A.    Yeah.

22   Q.    How does that process work?

23   A.    He calls you, you go in with your book, you sit down, and

24   you take the dictation, go back and transcribe it.

25   Q.    Is that how you do it to this day?
```

```
 1    A.    Yes, yeah.

 2    Q.    Do you ever --

 3    A.    When he dictates, yes.

 4    Q.    Does he or she ever use a Dictaphone?

 5    A.    No.

 6    Q.    So it's all personal dictation?

 7    A.    Yes.

 8    Q.    And then you type it up?

 9    A.    Yes.

10    Q.    What do you do with it after you've typed it up?

11    A.    I give it to him.

12    Q.    Does he or she -- let me ask you this, has there been a

13    female SAC during your time there?

14    A.    No, there hasn't.

15    Q.    So I'll refer to the SAC then as --

16    A.    Yes.

17    Q.    -- he.

18          Do you put any indication that you're the one that

19    prepared the document on the document.

20    A.    My initials.

21    Q.    And where do they --

22    A.    At the bottom of the -- whatever he's dictated.

23    Q.    And that would be --

24    A.    That would be with his initials and my initials.

25    Q.    For example, if the SAC were Larry Sarhatt and you
```

1    prepared the document --

2    A.    Yeah.

3    Q.    -- what would be at the bottom of the document?

4    A.    LS and slash DS.

5    Q.    Referring to Larry Sarhatt and Desi Sideropoulos?

6    A.    Sideropoulos.

7    Q.    Were you also involved in filing documents?

8    A.    Yes, personnel files, administrative files.

9    Q.    What's a personnel file?

09:10 10    A.    When we have new employees entering, I open up a personnel

11    file with just documents in it, you know --

12    Q.    What's an administrative file?

13    A.    Well, if anybody has done anything wrong, we -- you know,

14    seriously wrong, we open up an administrative file.

15    Q.    And are there certain files kept within the office of the

16    SAC alone?

17    A.    Yes.

18    Q.    Where would those documents be kept within the office?

19    A.    In my office, in the file cabinet.

09:11 20    Q.    Does the SAC also have a safe to put documents in?

21    A.    No, we don't have a safe now.

22    Q.    Did you have a safe at one time?

23    A.    Yes.

24    Q.    When did the safe disappear?

25    A.    I can't remember, really.  It would be a few years.  I

1    can't remember the date.

2    Q.    Just a few years ago?

3    A.    Yeah.

4    Q.    No more --

5    A.    A while ago, I would say.

6    Q.    Well, was this a safe in, for example, the '80s?

7    A.    Yes.

8    Q.    And the '70s?

9    A.    Yes.

09:11 10    Q.    And this was a safe that permitted the SAC to put

11    documents in there that he wanted to have for his eyes only,

12    right?

13    A.    Yes.

14    Q.    Does that phrase have meaning to you -- and by that I mean

15    "strictly eyes only"?

16    A.    Yes.

17    Q.    Would that be a phrase used by the SAC to you?

18    A.    Yes.

19    Q.    Would you tell the jurors what that phrase, "strictly eyes

09:12 20    only" meant, please?

21    A.    Personal and confidential for the SAC.

22    Q.    If a document were marked for that or with that, it was

23    personal and confidential to the SAC alone, correct?

24    A.    Yes.

25    Q.    Was that safe accessible to any of the regular agents?

1    A.    No.

2    Q.    Supervisory agent?

3    A.    No.

4    Q.    Even the Assistant Special Agent in Charge?

5    A.    No.

6          MR. CARNEY:  I'd like to approach the witness, please,

7    and show her a document that's been marked 1371, please, your

8    Honor?

9          THE COURT:  You may.

09:12 10   MR. KELLY:  Your Honor, may I have a brief moment with

11   counsel?

12         THE COURT:  Yes.

13         (Discussion off the record.)

14         MR. CARNEY:  Thank you, your Honor.

15         THE COURT:  You're welcome.

16   BY MR. CARNEY:

17   Q.   Ms. Sideropoulos, I'm showing you a document, and I'd

18   like -- I believe it's four pages.  I'd like you to just read

19   it to yourself, please.

09:13 20        Take all the time you need.

21        (Pause.)

22   Q.   Are you all set?

23   A.   Yes.

24         MR. CARNEY:  Your Honor, could Exhibit 1371 be put on

25   the monitor, please?

```
 1              MR. KELLY:  I assume he's offering it into evidence?

 2              MR. CARNEY:  Yes, I'm offering it into evidence.

 3              THE COURT:  Any objection?

 4              MR. KELLY:  No.

 5              THE COURT:  It may be admitted and published.

 6              1371, counsel, right?  Is that correct?

 7              MR. CARNEY:  Yes, your Honor.

 8              (Exhibit 1371 received into evidence.)

 9    BY MR. CARNEY:

10    Q.   Ms. Sideropoulos, this is the document that's in front of

11    you.

12              With the Court's permission, you can simply look at

13    this document, you don't have to look at this because this one

14    is easier to read, but I'll be asking you questions and

15    everyone else will be able to see that in the jury and her

16    Honor, so you need only look at that.

17    A.   Mm-hmm.

18    Q.   Okay.

19              Do you recognize what the cover sheet is?

20    A.   Yes.

21    Q.   Be careful with the mic, please.

22              Could you explain to the jury what this cover page is?

23    A.   It's a cover sheet that we put onto informant files.

24    Q.   Is this known as an FD-209?

25    A.   Yes.
```

```
 1   Q.   Who is the author of this 209?

 2   A.   SAC Larry Sarhatt.

 3   Q.   What was the date the document was prepared?

 4   A.   11/26/80.

 5   Q.   Is there an indication of the subject?

 6   A.   Yes.

 7   Q.   It's fair to say that that is a symbol for a specific

 8   person?

 9   A.   Yes.

10   Q.   And that person, if you know, was James Bulger?  If you

11   don't know, that's okay, too.

12   A.   Well, at the time I didn't know.

13   Q.   All right.  Then we'll move on.

14        It reflects that there was a date of contact, correct?

15   A.   Yes.

16   Q.   And what date was that?

17   A.   11/25/80.

18   Q.   Now, what is that box in the lower right?  What does that

19   mean?

20   A.   "This material may be subject to protective order"?

21   Q.   No.

22   A.   The lower right.

23   Q.   Lower right, right above it.  It's got initials in it, for

24   example?

25   A.   Oh, up there at the top?
```

1    Q.    Yes.

2    A.    Okay.

3          That's the file number, and then underneath is "LS,"

4    then the two dots, "DS," and "page 1."

5    Q.    What does "LS" mean?

6    A.    Larry Sarhatt.

7    Q.    And "DS"?

8    A.    Desi Sideropoulos.

9    Q.    And is the file number blanked out?  Is that why there's a

09:19 10    gray triangle on the front page?

11    A.    Yes, it's blocked off there, but not down at the bottom

12    regarding the dissemination.

13    Q.    Is that the "137 A"?

14    A.    Yes.

15    Q.    Now, this was a document that was a document that was

16    dictated to you by Larry Sarhatt?

17    A.    Yes.

18    Q.    And this reflects a meeting by Mr. Sarhatt with, from

19    reading this report, Mr. Bulger; is that correct?

09:19 20    A.    Mm-hmm, yes.

21    Q.    I'd like to direct your attention to the second page of

22    that memorandum.

23    A.    Mm-hmm.

24    Q.    Do you see the second paragraph beginning, "Informant was

25    asked"?

1    A.    Yes.  Yes.

2    Q.    We're just bringing it up.

3    A.    Okay.

4    Q.    This was the material that was dictated to you by Larry

5    Sarhatt?

6    A.    Yes, it was.

7    Q.    And could you read that paragraph for us, please?

8    A.    "Informant was asked whether he would divulge the identity

9    of the State Police source that has been furnishing information

09:20 10    to him and he stated that he would not because this source is

11    not doing it for monetary benefit but as a favor to him because

12    of his close association with him.  I asked him would I

13    normally talk to this individual during liaison of MSP rank

14    officers of my level.  Source indicated that I would not

15    normally talk to this individual as he is not of sufficient

16    rank within the MSP."

17    Q.    After you had typed this and given it to Mr. Sarhatt, did

18    he sign this?

19          You mentioned that he signed it on the first page,

09:21 20    right?

21    A.    On the first page.

22    Q.    Can we go to the last page of this document, please?

23    A.    Mm-hmm.

24    Q.    Do you see a paragraph entitled, "Observations"?

25    A.    Yes.

Q.   Is this the last part of the dictation by Larry Sarhatt to
you?

A.   Yes.

Q.   Was this in the original document that you typed?

A.   Yes.

Q.   I notice that there's a blackened-out word.  Why would a
word be blackened out?

A.   Because he didn't want it there.

Q.   So he would have scratched that out?

A.   Oh, yeah.

Q.   Maybe a misstatement by him or possibly a transcription
error or for some reason by blackening it out he corrected what
he meant to say, correct?

A.   Well, I might have had a little line there that said
something he didn't want in there.

Q.   Okay.

     So "Observations," could you read that paragraph
please?

A.   I am not certain that I am convinced that informant is
telling the full story of his involvement.  As at such as we no
longer need his informative -- his information concerning
another sensitive matter, consideration should be given to
closing him and not making him a target.

Q.   I'd ask you to read the bottom line one more time, please,
beginning with -- how about starting here, "Consideration

```
 1   should be given"?
 2   A.   Okay.  Consideration should be given to closing him and
 3   not --
 4   Q.   Does that word say "not"?
 5   A.   Oh, wait a second.
 6        "Consideration should be given to closing him and on
 7   making him a target."
 8   Q.   Yes.
 9        So this was the original certification of the document
10   that you typed up.
11   A.   That's right, that's right, yeah.  Yes.
12   Q.   Did he give you instructions about where to keep the
13   original of this document?
14   A.   He told me to keep it in an envelope, a sealed envelope.
15   Q.   And did he tell you to put it in the safe?
16   A.   Yes.
17   Q.   Did you prepare a cover sheet with that?
18   A.   Not with this.  I just put it in the envelope.
19   Q.   Okay.
20   A.   And marked it.
21        MR. CARNEY:  May I approach the witness?
22        THE COURT:  You may.
23   BY MR. CARNEY:
24   Q.   Ms. Sideropoulos, showing you a document previously
25   identified for identification as Exhibit 1373, I'd ask you to
```

1    take a look at that, and I'll take the other one back.

2    A.    Okay.

3          Do you want me to say -- read it off?

4    Q.    Not yet.  Can you look at the balance of it?

5          (Pause.)

6    Q.    Now, there is a cover sheet on that document, right?

7    A.    Yeah.

8    Q.    But -- and then the rest of the document is the memorandum

9    that you just told us about and read from.

09:24 10   A.    Yeah.

11   Q.    Including the paragraph "Observations," about

12   consideration should be given to closing this person and making

13   him a target?

14   A.    "And on making him a target."

15   Q.    And that's actually the same document that you've --

16   A.    This is my typing.

17   Q.    Okay.

18         What's different is this doesn't have the cover sheet

19   of an FD-209?

09:24 20   A.    That's right.

21   Q.    But instead has a piece of paper on it.

22   A.    Yes.

23         MR. CARNEY:  Your Honor, I would offer 1373, please.

24         THE COURT:  Any objection?

25         MR. KELLY:  No objection, your Honor.

```
 1              THE COURT:  It may be admitted and published, if you
 2    wish.
 3              (Exhibit 1373 received into evidence.)
 4              MR. CARNEY:  May it be published, please, 1373?
 5    BY MR. CARNEY:
 6    Q.   Ms. Sideropoulos, could you explain, please, for the
 7    jurors what the writing on that document says?
 8    A.   It says, "Strictly eyes-only per SAC Sarhatt."
 9    Q.   You've told --
10    A.   And my initial.
11    Q.   You've told us what "strictly eyes-only" means earlier,
12    right?
13    A.   Mm-hmm.
14    Q.   And when it says, "per SAC Sarhatt," what does that mean?
15    A.   I put that on there because he gave it to me.  So I put
16    "per SAC Sarhatt," and that was his instruction.
17    Q.   And you indicated that it contains that last paragraph --
18    A.   Yes.
19    Q.   -- about observations.
20              And did you put it in the safe?
21    A.   Yes, in a sealed envelope.
22              MR. CARNEY:  May I approach the witness again?
23              THE COURT:  You may.
24              MR. CARNEY:  Thank you.
25    BY MR. CARNEY:
```

```
 1    Q.   I'm showing you a third version which has some writing
 2    along the side.  Do you recognize that?
 3    A.   Mm-hmm, that's my writing.
 4         MR. CARNEY:  I intend to offer this, your Honor, as
 5    Exhibit 1372.
 6         THE COURT:  Any objection?
 7         MR. KELLY:  No objection.
 8         THE COURT:  It may be admitted, 1372.
 9         (Exhibit 1372 received into evidence.)
09:26 10      MR. CARNEY:  May it be published, please, your Honor?
11         THE COURT:  It may.
12    BY MR. CARNEY:
13    Q.   If the document is held this way, then it's obvious that
14    it's exactly the same cover as previously, correct?
15    A.   Mm-hmm.
16    Q.   But this top page has some writing on the side?
17    A.   Mm-hmm.
18         THE COURT:  You have to answer with a word.
19    A.   Yes.
09:27 20    Q.   I'm sorry, you have to say yes or no.
21    A.   Okay.
22         Yes.
23    Q.   This has some writing on the side?
24    A.   Yes.
25    Q.   Is it possible to rotate this one click?
```

1           (Pause.)

2    Q.    Whose writing is that?

3    A.    That's my writing.

4    Q.    And can you tell us what "62-5677" means?

5    A.    That's the file number.

6    Q.    Okay.

7           And in what type of folder was this kept?

8    A.    This is a file that's opened up, you know, a regular file

9    cover, like that.  (Indicating.)

09:28 10  Q.    Is it your writing?

11   A.    This is my writing.

12   Q.    Could you help us and read to the jurors what your words

13   were?

14   A.    "Mass. State Police allegations misconduct certain FBI

15   employees administrative inquiry."

16   Q.    "The Mass. State Police allegations misconduct certain FBI

17   employees."

18   A.    Yes.

19   Q.    What does that mean to you?

09:28 20         Did it mean anything to you?

21   A.    Yes.

22   Q.    Is that what Mr. Sarhatt asked you to write?

23   A.    That would be another file.  That's another file

24   completely.

25   Q.    Okay.

1          I'm showing you what's attached to it.

2          Do you recognize what's attached to it?

3  A.   The same thing that you just showed me with the 62 file

4  number.  And this would have gone in the 62 file, just like

5  this.  And I don't know why this appears on this, frankly.

6  Q.   All right.

7  A.   Okay.

8  Q.   Is this, again, this administrative file, one that

9  contains that memo with the observations in it?

09:29 10  A.   Yes.

11  Q.   Does it say "Observations"?

12  A.   "Observations," yes.

13  Q.   That's the identical memo that we've talked about before?

14  A.   Yes, but this was not on my cover right here.  I don't

15  know what this is, who put it there.

16  Q.   This writing --

17  A.   That's my writing.

18  Q.   That's yours?

19  A.   Oh, definitely.

09:30 20          MR. CARNEY:  Next, I'd like to approach

21  Ms. Sideropoulos and show her a final version of this.

22          THE COURT:  You may.

23          MR. CARNEY:  Your Honor, this version of the

24  document --

25          MR. KELLY:  Can I see the document first?

```
 1              THE COURT:  Sure.

 2              (Pause.)

 3              MR. KELLY:  Yes, sure.

 4              MR. CARNEY:  Your Honor, this version of the document

 5    was introduced by the government as Exhibit 355.

 6              THE COURT:  Okay.

 7              MR. CARNEY:  I'd ask that the first page of 355 please

 8    be called up.

 9              THE COURT:  It may be.

09:31 10    BY MR. CARNEY:

11    Q.   Ms. Sideropoulos, could you just take a moment and look on

12    the first page and the succeeding pages?

13              (Pause.)

14    Q.   Is there something different about this document

15    introduced by the prosecution than the other three documents

16    that I went over with you this morning that was introduced by

17    the defense?

18              And I focus on the last page.

19    A.   Yeah.

09:32 20    Q.   Is there something different?

21    A.   That's not my IBM.

22    Q.   How about content-wise?

23              Let me show you the previous --

24              Here I'm putting the last page of the three previous

25    exhibits.  Is there something missing --
```

1   A.   Yes, "Observations."

2   Q.   That is completely missing from the last page?

3        So can you read the words that are missing from the

4   document, Government Exhibit 355.  What's missing?

5   A.   Which one --

6   Q.   Just if you can read this.

7   A.   Okay.  "Additionally, another purpose for this meeting was

8   to be sure" --

9   Q.   No, I'm sorry.  The paragraph below that.

09:33 10   A.   Oh, "Observations."

11   Q.   Yes.

12   A.   "I am not certain that I am convinced that informant is

13   telling the full story of his involvement.  At such time as we

14   no longer need his information concerning another sensitive

15   matter consideration should be given to closing him and on

16   making him a target."

17   Q.   Can I have that?

18        Now, I'd like to direct your attention, please, to the

19   front of the file.

09:33 20        MR. CARNEY:  So could we go to page 1, please?

21   Q.   Now, there's some writing down here in the bottom right

22   corner.  And all the jurors can see the bottom right corner,

23   but why don't you just look at this document and identify first

24   what that number is, 137 A?

25   A.   That's the file number.

1    Q.    What file number?

2    A.    The informant file number.

3    Q.    All right.

4          And are there any signatures on that page?

5    A.    Right here, the signatures are the girl that filed it.

6    Q.    And what are her initials, if you can read it --

7    A.    I think it's GM.

8    Q.    Okay.

9          Is there a signature at the bottom of that box?

09:34 10   A.    Right here?

11   Q.    Yes.

12   A.    That's my writing.  I put "Connolly" on there.

13   Q.    Who were you referring to?

14   A.    John Connolly.

15   Q.    All right.

16         I'd ask you to look to the bottom left beginning at

17   the top.  Can you read that?

18   A.    Yes.  That went to supervisor Morris with his initial.

19   Q.    What does his initials indicate?

09:34 20   A.    That he read it.

21   Q.    All right.  Are there any other indications on there?

22   A.    What I have written down here, "per SAC to be filed in

23   administrative file."

24   Q.    And is there a signature or initials?

25   A.    Well, my initials.

1    Q.    Okay.

2          Thank you.

3          Ms. Sideropoulos, how long would the average SAC stay

4    in the office?

5    A.    I would say about three years, four years, the average.

6    Q.    And then he would be transferred, usually to another city

7    or to Washington?

8    A.    Or retire.

9    Q.    When Larry Sarhatt gave you that document, did he tell you

09:35 10    what to do with it when -- and I'm talking about the version

11    that was in the safe -- did he tell you what to do with it when

12    a new SAC came to Boston to take his place?

13    A.    Yes.  He told me to make sure the new SAC --

14    Q.    Tell the jurors, please.

15    A.    He told me to make sure that the new SAC read it.

16    Q.    Did you do that?

17    A.    Yes.

18    Q.    And did they read it?

19    A.    Yes.

09:36 20    Q.    At some point did an SAC named Ahern, if I'm pronouncing

21    that correctly, come to Boston?

22    A.    Yes.

23    Q.    Did you follow the same policy with --

24    A.    Yes.

25    Q.    And did he give you directions what to do?

1    A.    Well, I'm not sure it was Jim Ahern that told me to do it,

2    but he told me to destroy it.

3    Q.    What did he say when he told you that?

4    A.    He told me to destroy it or we'll all get fired.

5    Q.    So this document that was in the SAC safe with that

6    additional paragraph on it that was not on the paragraph -- not

7    on the version introduced as Government's Exhibit 355, was that

8    version destroyed by you?

9    A.    Yes.

09:37 10    Q.    Pursuant to the direct order of the SAC at the time.

11    A.    Yes.

12    Q.    You learned that you were going to be called as a witness

13    in this case at some point recently; is that right?

14    A.    Yes.

15    Q.    And when you did that, when you learned that, did you

16    speak to the prosecutors?

17    A.    About what I just said?

18    Q.    Yes.

19    A.    No, I didn't speak to prosecutors about what I just said.

09:37 20    Q.    Who did you speak to?

21    A.    I spoke to one of our supervisors.

22    Q.    Within the FBI?

23    A.    Yeah.

24    Q.    And that document that had been destroyed, were you able

25    to recreate it?

```
 1   A.    No.  Well, I don't know what you mean.

 2   Q.    Well --

 3              MR. CARNEY:  If I may approach the witness, please?

 4              THE COURT:  You may.

 5              MR. KELLY:  Your Honor, I object.

 6              May I approach sidebar?

 7              THE COURT:  Yes.

 8              (At sidebar on the record.)

 9              MR. KELLY:  I object to the defense counsel showing an

10   e-mail from me to him explaining the scenario.

11              If he wants to lead her and ask her, Did you meet

12   Mr. Kelly and were able to piece together, that's fine, but I

13   don't want a discovery e-mail from government to defense

14   counsel to be entered into Court.

15              MR. CARNEY:  May I show your Honor?

16              THE COURT:  Sure.

17              MR. CARNEY:  It may then be apparent.

18              I'd want to use it to refresh her recollection.

19              (Pause.)

20              MR. CARNEY:  And I would not identify the document

21   before the jury.

22              THE COURT:  Okay.

23              MR. CARNEY:  I also have not mentioned Mr. Kelly by

24   name, and I would not do so.

25              THE COURT:  Okay.
```

1          I understand you're just using this to refresh.

2          MR. CARNEY:  Yes, your Honor.

3          THE COURT:  I think that's fine, given what I think

4    she's testified about and what I think you're trying to elicit.

5          MR. CARNEY:  I'm not going to have this marked as an

6    exhibit.

7          THE COURT:  Okay.

8          MR. CARNEY:  I'm not going to identify Mr. Kelly by

9    name.

09:41 10          THE COURT:  Okay.

11          MR. CARNEY:  I'm not even going to refer to this as

12   communication -- a discovery communication to the defense.  I

13   just wanted to show it because I assume her memory will be

14   refreshed when she reads that.

15          She recreated the fourth version.

16          THE COURT:  Okay.

17          MR. KELLY:  So you're just going to use this to

18   refresh the witness' memory.

19          MR. CARNEY:  Yes.

09:41 20          MR. KELLY:  And you are not going to indicate that

21   there were e-mail communications --

22          MR. CARNEY:  No, in fact, the record should reflect I

23   have just folded over the top of the e-mail so it's not

24   apparent that this is an e-mail.

25          MR. KELLY:  Okay.

 1                THE COURT:  Okay.

 2           That's fine.

 3           I think it would be appropriate testimony, if she's

 4  further confused, to lead here, counsel.  I would allow that.

 5                MR. KELLY:  If what, ma'am?

 6                THE COURT:  To lead in this area.

 7                MR. KELLY:  Yes.

 8                MR. CARNEY:  Thank you.

 9           (End of discussion at sidebar.)

09:41 10  BY MR. CARNEY:

11  Q.   Ms. Sideropoulos, I'm going to show you a document, I just

12  want you to, please, read it to yourself, and then I'll ask you

13  a question afterwards.  All right?

14  A.   Mm-hmm.

15  Q.   Okay.

16           And take your time, as always.

17           (Pause.)

18  BY MR. CARNEY:

19  Q.   Did you have a chance to read it?

09:43 20  A.   Yes.

21  Q.   Ms. Sideropoulos, does this refresh your memory that you

22  were asked to try to recreate the document that you destroyed

23  pursuant to the direction of the SAC?

24  A.   Well, I really don't know what "recreate" means.

25  Q.   What I mean by "recreate" is did someone ask you if you

1    could put together the document that had been kept in the safe

2    that you had destroyed?

3    A.    To put together a document?  No.

4    Q.    Well, to get paperwork together that would be the same as

5    what had been in the safe.

6    A.    You mean now, after -- no.

7    Q.    That didn't happen?

8    A.    No.

9    Q.    Okay.

09:44  10         The document that you destroyed no longer exists,

11    correct?

12    A.    Correct.

13    Q.    And it's fair to say that the way you are able to show us

14    what was the document that was destroyed that had the

15    additional paragraph on it, was by looking to another source

16    where you knew you could get that version of the document,

17    right?

18    A.    Yes.

19    Q.    Okay.

09:44  20         MR. CARNEY:  If I may just have one moment, please,

21    your Honor.

22         THE COURT:  Sure.

23         MR. CARNEY:  Thank you very much, and --

24         THE WITNESS:  Thank you.

25         MR. CARNEY:  -- thank you for your long service.

```
 1                THE WITNESS:  Thank you.

 2                MR. CARNEY:  That's all I have, your Honor.

 3                THE COURT:  Mr. Kelly?

 4                MR. KELLY:  Yes, your Honor, just briefly.

 5                THE COURT:  Sure.

 6                MR. KELLY:  One moment, your Honor.  May I first

 7      consult with Tom Barnico, our excellent paralegal here?

 8                THE COURT:  Yes.

 9                (Discussion off the record.)

09:45 10                        CROSS-EXAMINATION

11      BY MR. KELLY:

12      Q.   Good morning.

13      A.   Good morning.

14      Q.   I just want to briefly ask you about these documents that

15      Mr. Carney was asking you about.

16                And first I'd like to show you his Defense Exhibit

17      1371, the one he showed you at first.

18                (Discussion off the record.)

19      Q.   All right.

09:47 20                So this was the first document he showed you, ma'am,

21      right?

22      A.   Yes.

23      Q.   And up in the top here, that little Bates stamp number,

24      right?

25      A.   Yes.
```

1  Q.   That signifies we produced this in discovery many months

2  ago to the defense, right?

3          MR. CARNEY:  Objection.

4          THE COURT:  Well, I don't think she has any base of

5  knowledge, counsel.

6  BY MR. KELLY:

7  Q.   Well, let me ask you this question --

8          THE COURT:  Sustained as to that question.

9  BY MR. KELLY:

09:47 10  Q.   Are you aware -- did you put that Bates stamp number up

11  there, ma'am, at the top?

12  A.   The stamp that is blocking off something?

13  Q.   No, see up top where I've put the lines, that little

14  number up there?

15  A.   Oh, yes, I see.  No, I didn't put that there.

16  Q.   That's not your work, right?

17  A.   No.

18  Q.   Okay.

19          And let's go now to, if we could, Exhibit 355-00189,

09:47 20  which is already in evidence in this case.

21          MR. KELLY:  It's 355-00189, please.

22  Q.   And this is the one Mr. Carney referenced as being in

23  evidence, right, that did not have the "observations" at the

24  end, right?

25  A.   Yes.

1   Q.   And this is, I'm circling at the bottom, that's in an

2   informant file, right?

3   A.   Yes.

4   Q.   So this version has all the information about the

5   person -- the statements the person makes are in here, right?

6   This version is the one that doesn't have the observations,

7   correct?

8   A.   Yes.

9   Q.   And that's because it's a 137 file, right?

09:48 10        MR. CARNEY:  Objection.

11  A.   Yes.

12             MR. CARNEY:  Please.

13             THE COURT:  Well, sustained as to that question.

14             The answer will be struck.

15             You can ask another question based on this witness'

16  knowledge.

17  BY MR. KELLY:

18  Q.   This version is in 1544's informant file, right?

19  A.   Yes.

09:49 20  Q.   And 1544, as indicated, is a reference to James Bulger,

21  right?

22  A.   Yes.

23  Q.   All right.

24  A.   Now I know.

25  Q.   So this version, the one without the "observations," is

1  the one actually in his file, right?

2  A.   Yes.

3  Q.   Now, Mr. Carney also showed you a separate version, which

4  is in what's called an administrative inquiry file.  Let me

5  refer to defense Exhibit 1372.

6       MR. KELLY:  I think we can call that one up.  I think

7  we have that one loaded in.

8       MR. CARNEY:  We can --

9       MR. KELLY:  Thank you, but I think we've got this one,

09:49 10  thanks.

11  BY MR. KELLY:

12  Q.   If we could go to -- and up here, this 62 --

13       MR. KELLY:  Let's see if we can rotate that, please.

14  Q.   This is a reference to what you referred to as a 62 file,

15  right?

16  A.   Yes.

17  Q.   So that means it's an administrative inquiry file, right?

18  A.   Yes.

19  Q.   So these different versions get sent to different files

09:50 20  within the FBI, right?

21  A.   Yes.

22  Q.   An administrative inquiry file is when basically there's

23  allegations that somebody did something wrong, right?

24  A.   Yes.

25  Q.   And this particular administrative inquiry file pertains

1   to the Lancaster Street garage controversy, correct?

2   A.   Yes.

3   Q.   All right.

4        And so on this one --

5        MR. KELLY:  -- if I could see the next page, please --

6   Q.   This one has the more typical face sheet, the 209, again,

7   a 62 on it, right?

8   A.   Yes.

9   Q.   So the one -- obviously, the one that you had in the safe

09:50 10  that got destroyed is no longer here, right, that's why -- it

11  got thrown away, right?

12  A.   Yes.

13  Q.   So the only way, to use Mr. Carney's words, to recreate

14  something that's not here is you took out this page, right?

15       I'm not being clear.

16  A.   No, because I never took out a page.

17  Q.   Do you remember when you -- we were trying to piece

18  together what it is that was thrown away and we showed you a

19  version without this page?  If you take out this page, you get

09:51 20  Defense Exhibit 1373, don't you?

21       MR. KELLY:  Can we call up 1373?

22  A.   Yes.

23       MR. KELLY:  Let's see the second page of that one.

24  Q.   All right.

25       So the form, the administrative form, is not on this

1    one.  The substance is the same, but that was the way to figure

2    out what was in the safe, right?

3    A.   Yes.

4    Q.   All right.

5         Now, with respect to this, ma'am -- this is the one

6    that has an observation at the end, right?

7    A.   Yes.

8    Q.   Okay.

9         And this one is something, like the first one, that

09:52 10   Mr. Sarhatt dictated to you, right?

11   A.   Yes.  But I can't see the last page.

12   Q.   Okay.

13        Let me show you the last page.

14   A.   Yes.

15   Q.   So this is the one which goes -- this goes into an

16   administrative inquiry file because there's a concern that

17   someone did something wrong, right?

18   A.   Yes.

19   Q.   But his informant file that's in evidence already would

09:52 20   not have that, would it?

21   A.   Right.

22   Q.   So there's nothing unusual about that.

23   A.   Mm-hmm.

24   Q.   But let me ask you this:  You knew this was about James

25   Bulger when Mr. Sarhatt dictated it to you, right?

1    A.    Yes.

2    Q.    And --

3          MR. KELLY:  Could I have that one still up, please?

4    Q.    And you only typed one memo for Mr. Sarhatt about Bulger,

5    right?

6    A.    Yes.

7    Q.    And let me just show you a couple lines in here.

8          MR. KELLY:  Let's go to the first page.

9          And the next page, please.

09:53 10          If you could highlight the second line where it says,

11    "I met with BS 1544."

12    Q.    Where it says, "I met with BS-1544 TE for approximately

13    four hours," that was Mr. Sarhatt dictating that to you, right?

14    A.    Yes.

15    Q.    And 1544 was Bulger, correct?

16    A.    Yes.

17    Q.    And where it says, "BS" -- -Bulger -- "furnished

18    information about his early childhood, his criminal activity,

19    incarceration and association with the FBI," then there's the

09:54 20    reference to Lancaster Street garage, that's all something

21    Mr. Sarhatt, the SAC, dictated to you, right?

22    A.    Yes.

23    Q.    And how about down below in the third paragraph, where it

24    says, "Informant's intention to help the FBI," that's what

25    Mr. Sarhatt dictated to you, right?

1    A.    Yes.

2    Q.    The next paragraph, again, referencing Mr. Bulger, where

3    it says, He's fully aware that the State Police -- which is the

4    MSP -- is aware of his informant role with the FBI.  That's

5    what Mr. Sarhatt, the SAC, dictated to you, isn't it?

6    A.    Yes.

7    Q.    Finally, in the last page, in this "Observations" section

8    that was put into the administrative inquiry file, where it

9    says he's not convinced that the informant is telling the full

09:55 10    story of his involvement, it was Mr. Sarhatt, after meeting

11    with Bulger for four hours, who dictated the reference to the

12    informant, correct?

13    A.    Yes.

14    Q.    And it was Mr. Sarhatt, the SAC, who was concerned that

15    perhaps he should be targeted at some point, correct?

16    A.    Yes.

17          MR. KELLY:  Nothing further.

18          THE COURT:  Any redirect, Mr. Carney?

19          MR. CARNEY:  Yes, your Honor.

09:55 20                        REDIRECT EXAMINATION

21    BY MR. CARNEY:

22    Q.    You've read that memo this morning?

23    A.    Yes.

24    Q.    When I had you look it over?

25    A.    Yes.

```
 1    Q.    Once or twice?

 2    A.    Yes.

 3    Q.    And you read all the details?

 4    A.    Yes.

 5    Q.    It's fair to say that Mr. Bulger provided absolutely zero

 6    information to Sarhatt about any other person doing anything;

 7    isn't that true?

 8              MR. KELLY:  Objection.

 9              THE COURT:  Sustained as to form.

09:56 10    BY MR. CARNEY:

11    Q.    Mr. Bulger did not provide a name of anybody, did he?

12    A.    Not that I would know of, according to the memo.

13    Q.    Thank you.

14              Oh, and that type of memo would not be shown to anyone

15    else who had been at the meeting to see if it was accurate,

16    right?

17    A.    No, he would have indicated.

18    Q.    So that's the memo he wanted to write, right?

19    A.    Yes, yes.

09:56 20    Q.    And it certainly wasn't shown to anyone else at the

21    meeting who could say whether that memo accurately reflects

22    what happened or not?

23    A.    Yes.

24              MR. CARNEY:  Thank you.

25              THE COURT:  Mr. Kelly.
```

1           MR. KELLY:  Briefly.

2                       RECROSS-EXAMINATION

3    BY MR. KELLY:

4    Q.   Ma'am, just a couple of questions.

5           Certainly you didn't think Mr. Sarhatt was being

6    inaccurate when he said he met with Bulger for approximately

7    four hours, did you?

8           MR. CARNEY:  I object.

9           THE COURT:  Sustained.

09:57 10   BY MR. KELLY:

11   Q.   Well, when he dictated to you that he met with Bulger for

12   approximately four hours, did he appear to be, in fact, serious

13   about this?

14          MR. CARNEY:  Object.

15          THE COURT:  Sustained as to form.

16   BY MR. KELLY:

17   Q.   Was Mr. Sarhatt a man who would just make stuff up and

18   have you dictate it?

19          MR. CARNEY:  Your Honor, I object and ask that even

09:57 20   the question be stricken.

21          MR. KELLY:  I'm going over his redirect suggesting he

22   was inaccurate in some way.

23          THE COURT:  Counsel, sustained as to the form of that

24   question.

25   BY MR. KELLY:

1   Q.   Ma'am, you dictated (sic.) this accurately, right?

2           THE COURT:  Mr. Carney.

3           MR. CARNEY:  I know I'm going to be objecting to every

4   question.

5           (Laughter).

6           MR. CARNEY:  Rather than make it that I'm at Zumba

7   class, I'm going to stand here.

8           (Laughter.)

9           THE COURT:  I think you can sit down.  I think

09:58 10  Mr. Kelly can ask a question about whether it was -- whether

11  everything that was dictated was what she wrote down and

12  transcribed.

13  BY MR. KELLY:

14  Q.   Yes.  Ma'am, you typed this up accurately, didn't you?

15  A.   Yes.

16  Q.   All right.

17          And this is what Mr. Sarhatt told you, right?

18  A.   Yes.

19  Q.   And it wasn't your job to meet with Mr. Bulger for four

09:58 20  hours, was it?

21  A.   No.

22  Q.   It wasn't your job to classify him as an informant, was

23  it?

24          MR. CARNEY:  I object, argumentative.

25          THE COURT:  Sustained.

1    BY MR. KELLY:

2    Q.   In fact --

3           MR. KELLY:  If he could sit down so I could see the

4    witness, your Honor.

5           (Laughter.)

6    BY MR. KELLY:

7    Q.   It was your typing up what Mr. Sarhatt told you which is

8    in this memo, correct?

9           MR. CARNEY:  Object, asked and answered.

09:58 10        THE COURT:  Sustained.

11   BY MR. KELLY:

12   Q.   You fairly and accurately typed up what your boss,

13   Mr. Sarhatt, told you, right?

14   A.   Yes.

15          MR. KELLY:  Thank you.

16          MR. CARNEY:  Asked and answered.

17          MR. KELLY:  Nothing further.

18          THE COURT:  I think we've had several rounds, we're

19   all done.

09:59 20        THE WITNESS:  Am I all set?

21          MR. CARNEY:  Yes, you are.

22          (Discussion off the record.)

23          THE COURT:  Mr. Carney?

24          MR. CARNEY:  Your Honor, at this time I -- I wondered

25   if I could inform the jury or your Honor can inform the jury --

1           THE COURT:  Counsel, let me just see one

2    representative of the government and Mr. Carney.

3           (At sidebar on the record.)

4           THE COURT:  So, counsel, I'm presume you want to now

5    read Marion Hussey's testimony.

6           Here's what I would propose to say.  You're now going

7    to hear the recitation of prior testimony from a bench trial of

8    Judge Young and an excerpt from a deposition, and I'll mention

9    dates.  I'll say, You've previously heard reference made to

10:01 10   transcripts and testimony from prior proceedings sometimes that

11   were offered for impeachment, sometimes for substantive

12   purposes, which I'll talk to you more about in my closing

13   instructions.  This testimony is being offered because the

14   witness is unavailable and should be treated the way all the

15   testimony of live witnesses would be treated.

16          Okay?

17          MR. KELLY:  Yes.

18          MR. CARNEY:  Yes.

19          THE COURT:  I'll turn to you, and you can read it.

10:01 20        MR. CARNEY:  Just so your Honor knows, I'm just

21   reading it in chronological order.  The deposition is in 2004,

22   the trial testimony is in 2009.

23          THE COURT:  Okay.

24          MR. CARNEY:  Thank you.

25          (End of discussion at sidebar.)

1              THE COURT:  Jurors, this is one of those junctures

2    where I need to give you an instruction before you hear the

3    next part of the proffered evidence here.

4              What you're about to hear is testimony given by Marion

5    Hussey from a deposition in December of 2004, and then in the

6    course of a trial before another judge in this building in

7    another matter in 2009.

8              Throughout this trial you've heard reference during

9    the testimony of various witnesses to prior testimony, either

10:01 10   in a deposition or before a grand jury or in other trial

11   proceedings.  Sometimes those references were made for the

12   purposes of impeaching a witness about what they may have said

13   on previous occasions, on a few occasions those references were

14   offered as substantive evidence.  I'm going to give you fuller

15   instructions about the distinction when I give you final

16   instructions.

17             What Mrs. Hussey's testimony is being offered for now

18   is because she's unavailable to testify before you live.  So

19   you're to treat what is being read to you now as if she

10:02 20   testified live, and you are to judge its credibility and give

21   whatever weight you think appropriate as if she had testified

22   in person before you.

23             Okay?

24             Thank you.

25             Mr. Carney?

1          MR. CARNEY:  Thank you.

2          May I stand here?

3          THE COURT:  You may.

4          MR. CARNEY:  The first excerpt is from a deposition

5    under oath taken of Marion Hussey --

6          THE COURT:  I'm just going to ask you to keep your

7    voice up because Ms. Joyce is behind you.

8          MR. CARNEY:  Okay.

9          THE COURT:  Thank you.

10:03 10          MR. CARNEY:  The first excerpt is from a deposition

11    taken under oath of Marion Hussey.  It's an excerpt of a

12    285-page document.  The three people being referred to in this

13    excerpt are Marion Hussey, herself; her daughter, Deborah

14    Hussey; and Ms. Hussey's boyfriend, Stephen Flemmi.

15          I will indicate what the question was and every answer

16    is the answer given by Marion Hussey, who is Deborah Hussey's

17    mother, as you've heard from the prior testimony.

18          "Q.  And then I guess it got more serious, she got

19    into more drugs?

10:04 20          "A.  Well, that's what Steve used to tell me.  When he

21    came home, that's when the problems were really, you know, that

22    she was coming home wiped out, or he would take her and put her

23    someplace to, you know, to live, or she'd move in with

24    different people, you know, friends of hers, and, you know,

25    from time to time he used to come in -- always everything

1    derogatory about her, used to turn the kids off.  Billy, and

2    more so, my oldest boy.

3              "Q.  What would he say?

4              "A.  You know, she's no good, she's a slut, she's a

5    whore, she's a prostitute, and she's out there doing drugs.

6              "Q.  Was that accurate?  Was she --

7              "A.  No.  I don't know, to be honest with you.  I know

8    to some extent it was, but, I mean, this is before I knew of

9    anything that was going on."

10:05  10            The second document is from a trial conducted in the

11   United States District Court in which the parties included the

12   Estate of Deborah Hussey v. The United States of America.

13            Here again is the testimony of Marion Hussey talking

14   about her daughter, Deborah Hussey, and her live-in boyfriend

15   at the time, Stephen Flemmi.

16            "Q.  Was there a time where you kicked Stephen Flemmi

17   out of the house?

18            "A.  Yes.

19            "Q.  All right.  And when was that?

10:06  20            "A.  It was in 1982.

21            "Okay.

22            "A.  October of '82.

23            "Q.  All right.  And tell us what happened."

24            Marion Hussey answers:  "I had been working, I was

25   working at a bank.  I had come home from work, and I don't know

1    if he was there at the house when I came in or he came in after

2    me, but I think he was there because he was arguing with me

3    about Debbie, she was upstairs, which was her bedroom at the

4    time.

5         "Q.  --

6         MR. KELLY:  It says, "at one time."

7         MR. CARNEY:  "At one time," correct.

8         "Q.  Okay.  What was he arguing with you about Debbie?

9         "A.  She was all drugged up or drunk or whatever, I

10:07 10   don't know which, and we were arguing about it, you know.  I

11    was nervous with her being there with the other kids.

12         "Q.  And why was that?

13         "A.  Well, I didn't want them to see her the way she

14    was.  My grandson was probably living with me, he was only a

15    baby.  I mean, there were times that she came in that she was,

16    you know, all drugged up.  I put her out of the house, told her

17    to leave.

18         "Q.  Okay.  And why when she was drugged up did you

19    tell her to leave the house?

10:08 20   "A.  She wasn't living with me at that time.  She was

21    back and forth.  She was in California.

22         "Q.  When did Debbie last live with you full time?

23         "Probably the late '70s.

24         "Q.  Okay.  And going back to what happened in October

25    of 1982, what happened after you were arguing with Stephen

1    Flemmi about Debbie being drugged up?

2        "A.  I went upstairs, and she was in the bed.  She had

3    clothes on or her pajamas on, or whatever, and he was, like,

4    slapping her around, and, you know, I don't know exactly how it

5    would come out.  I said to him, you know, We've got to get her

6    out of here.  He was -- I don't know what he said to her, and I

7    don't know exactly what I said to him, and that's when she said

8    to" me -- it says "to my" -- "oh, something about sucking his

9    prick.  I've been doing it, she said, for years.  I just

10:10 10   couldn't believe what I heard.

11       "Q.  How did you react to that statement?

12       "I was floored.  I just -- I went weak.  I left the

13   room.

14       "And what happened next, Mrs. Hussey?

15       "I went downstairs and he -- he -- he got her ready,

16   he got her dressed or whatever.  I went downstairs to my room,

17   my bedroom was downstairs and all the kids' bedrooms were

18   upstairs, and he went out the door with her, the backdoor, and

19   she said to me, 'Ma,' she says, 'I'm not lying.'  And I said,

10:10 20   'Debbie, I believe you.'  And she went out the door.  I hadn't

21   seen her after that.  I was just floored.  He took her

22   somewhere, I don't know where he took her, and he came back

23   home later that night.

24       "Q.  What happened when he returned that night?

25       "A.  Went downstairs.  I had a big house in Milton.

1    We went downstairs so the other kids couldn't hear us in the

2    library downstairs.  We were talking about -- I told him -- I

3    said, 'When I come home from work tomorrow, I want everything

4    you want, everything you own, I want out of the house,' I said,

5    'Because whatever you leave, I'm throwing out.'

6            "Q.  And did he leave the next day?

7            "A.  When I came home from work, the majority of the

8    stuff was gone.  What he left I threw out."

9            Thank you.

10:12  10        MR. CARNEY:  May these be marked as exhibits, please?

11            THE COURT:  For identification, counsel?

12            MR. CARNEY:  No, your Honor, as exhibits.

13            THE COURT:  Mr. Kelly, any objection?

14            MR. KELLY:  No, your Honor.

15            THE COURT:  Okay.

16            They may be -- next numbers?

17            MR. CARNEY:  1403 would be the deposition, 1404 would

18    be the trial, and we'll provide it on a CD to Ms. Hourihan.

19            THE COURT:  Okay.

10:12  20        They may be marked and admitted.

21            (Exhibits 1403, 1404 received into evidence.)

22            THE COURT:  Next witness?

23            MR. CARNEY:  John Martorano is called by the defense.

24            JOHN MARTORANO, having been duly sworn by the Clerk,

25    was examined and testified as follows:

```
         1              THE CLERK:  Thank you.

         2              THE COURT:  Good morning.

         3              THE WITNESS:  Good morning.

         4              THE COURT:  Mr. Carney.

         5              MR. CARNEY:  Thank you, your Honor.

         6                        DIRECT EXAMINATION

         7    BY MR. CARNEY:

         8    Q.   Good morning, Mr. Martorano.

         9    A.   Good morning.

10:14   10    Q.   I'll wait until you pour the water.

        11              (Pause.)

        12    Q.   Mr. Martorano, of course it's true that you previously

        13    testified in this trial several weeks ago; is that right?

        14    A.   Correct, correct.

        15    Q.   And at that time, you related the agreement that you had

        16    with the government; is that correct?

        17    A.   Correct.

        18              MR. WYSHAK:  I object to this, your Honor.  It was a

        19    very limited proffer made.

10:14   20              THE COURT:  Sustained.

        21              Counsel.

        22    BY MR. CARNEY:

        23    Q.   Focusing your attention on the 1970s and '80s, did you

        24    meet a woman named Debbie Davis?

        25    A.   Yes.
```

```
 1    Q.    Is it fair to say she was a teenager at the time?

 2    A.    Correct.

 3    Q.    Do you remember, sir, where you first met her?

 4    A.    I believe it was Taylor Jewelry Store.

 5    Q.    Is that in Brookline?

 6    A.    Yes.

 7    Q.    What was she doing at the store?

 8    A.    I think she was a counter girl.

 9    Q.    Did you make her acquaintance?

10:15 10    A.    Yes.

11    Q.    Did Stevie Flemmi, to your knowledge, at some point meet

12    her?

13    A.    Correct.

14    Q.    Did they get to know each other better, to your knowledge?

15    A.    Yes.

16    Q.    And what happened after that?

17    A.    They started dating.

18    Q.    When they began dating, Stephen Flemmi was how old,

19    approximately?

10:15 20    A.    I'm not sure.

21         MR. WYSHAK:  Again, I object to this, your Honor.

22    This is beyond the proffer.

23         THE COURT:  Sustained.

24         Mr. Carney, I allowed you to ask these questions for

25    the context of what you had proffered the testimony for.
```

1          MR. CARNEY:  I'm trying to show the relationship among

2     all of the witnesses that I mentioned.

3          MR. WYSHAK:  I object.

4          Can we have a sidebar?

5          THE COURT:  I'll hear you briefly at sidebar, counsel.

6          (At sidebar on the record.)

7          MR. CARNEY:  May I make an offer of proof?

8          THE COURT:  Well, first --

9          MR. WYSHAK:  It's my objection.

10:20 10        THE COURT:  Wait a second.

11         Counsel, I understood the proffer that you were

12    calling him for was to impeach Mr. Flemmi's testimony in

13    regards to a statement that Mr. Flemmi made to Mr. Martorano

14    about her death.  I allowed the few questions about when he met

15    Ms. Davis to make clear that he knew her, and that he was aware

16    of Mr. Flemmi's relationship with her, but I see the

17    question -- the reason I sustained the other objections is

18    because I thought those were going beyond the scope of the

19    proffer, and given the extensive examination that was conducted

10:20 20   of Mr. Martorano, both by the government and the defense, I see

21    no need to retread over ground that's been covered and I

22    imagine is still in the memory of the jurors.

23         MR. CARNEY:  What I want to ask is information that

24    was not covered during the cross, because we didn't deal with

25    these statements during the initial testimony of Mr. Martorano.

1          If permitted to testify, I expect the witness would

2     say --

3          THE COURT:  Keep your voice down.

4          MR. CARNEY:  I expect the witness would say that he

5     knew of the relationship of ten years between Mr. Flemmi and

6     Ms. Davis, and most importantly, that Mr. Martorano and his

7     lady friend would socialize, go out on double dates with

8     Mr. Flemmi and Ms. Davis, so that this witness had an

9     opportunity to develop that type of social relationship with

10:20 10     Debbie Davis.

11          The reason I'm offering this limited testimony is to

12     put in context why he would be interested in the fact that

13     Debbie Davis disappeared, and why he would ask Stephen Flemmi

14     what happened, where is she?  And without this, it just seems

15     incongruous that he would ask.  But if the jury knows that they

16     socialized, went out on dates together, that would be why

17     Martorano would naturally ask about her absence.

18          That's all I'm asking.

19          THE COURT:  Do you have any objection to that line for

10:20 20     context?

21          MR. WYSHAK:  I do, your Honor.

22          First, this is not new information, this is all

23     information that was produced in discovery that Mr. Carney has

24     had for years.  Why they didn't ask these questions when they

25     had full opportunity to do it does not now give them the right

1    to recall the witness to trod this ground that they didn't trod

2    when they had a full and fair opportunity to do so.

3            The one area that is he's being recalled for is to

4    impeach Flemmi on a prior statement, and I think that's fair.

5    But just because he either missed it or chose not to go into it

6    when he had the witness on cross-examination for two days does

7    not now give him the right to redo his cross.

8            THE COURT:  Counsel, based on the limited questions

9    you gave me, I'll allow those for context for the statement,

10:20 10    but I expect that you're going to get to the statement pretty

11    quickly.

12            MR. CARNEY:  I will, your Honor.

13            THE COURT:  And I don't think there's any need to

14    elicit the details of sort of the socializing other than that

15    they were social and had repeated contact.

16            MR. CARNEY:  Thank you.

17            (End of discussion at sidebar.)

18    BY MR. CARNEY:

19    Q.   Let me put the question to you again, Mr. Martorano.

10:20 20            You occasionally socialized with Stephen Flemmi and

21    Debbie Davis, didn't you?

22    A.   Yes.

23    Q.   On several occasions; isn't that fair to say?

24    A.   Correct.

25    Q.   And that's how you got to know Debbie, right?

```
 1   A.   Correct.

 2   Q.   There came a time when Debbie Davis was no longer seen by

 3   anyone; is that fair to say?

 4   A.   Correct.

 5   Q.   She had disappeared, right?

 6   A.   Yeah.

 7   Q.   And you had a conversation with Stevie Flemmi about this,

 8   didn't you?

 9   A.   Correct.

10:21 10   Q.   Is it fair to say Stevie Flemmi was your friend?

11   A.   Yes.

12   Q.   You asked Stevie Flemmi what happened to Debbie Davis,

13   right?

14   A.   I asked how she's doing.

15   Q.   And did Stevie Flemmi tell you what had happened?

16        And I want you to tell the jurors what Stevie Flemmi

17   said to you.

18   A.   In so many words -- a lot of times we talked cryptic, but

19   out of the conversation that I got that she was gone, and I

10:21 20   said, What do you mean?  He said, She's not coming back.  And I

21   took it to mean that she was gone, and that's the conversation.

22   Q.   Did you ask her -- did you ask Stevie Flemmi what

23   happened?

24   A.   Yeah, I believe I did.

25   Q.   And isn't it true that he told you, "I strangled her, it
```

```
 1   was an accident"?

 2   A.   My best recollection out of the way the encryptions went

 3   with the conversation, that's what I took out of it.

 4   Q.   Well, you've testified about this on a couple of previous

 5   occasions, haven't you?

 6   A.   Yeah, that's what it is.

 7        MR. WYSHAK:  Objection, it's direct examination.

 8        THE COURT:  I'll allow that question, but, counsel,

 9   direct examination.

10:22 10   BY MR. CARNEY:

11   Q.   You've testified about this specific encounter on at least

12   two occasions, haven't you?

13   A.   Correct.  I believe so.

14   Q.   And you were --

15        MR. WYSHAK:  Objection.

16        THE COURT:  Counsel, direct examination.

17        Sustained as to the objection.

18   BY MR. CARNEY:

19   Q.   And you were -- you have been asked:  Did Steve explain

10:23 20   what happened?  Haven't you?

21   A.   Yes.

22   Q.   And isn't it fair to say --

23        MR. WYSHAK:  I object to this.  The witness is

24   testifying, he's not eliciting an inconsistent statement.

25        MR. CARNEY:  I'm trying to clarify what the exact
```

1    language was.

2           THE COURT:  Overruled on that basis.

3    BY MR. CARNEY:

4    Q.   He said he strangled her; isn't that correct?

5    A.   He said it was an accident, he strangled her.

6    Q.   It was an accident, he strangled her.

7    A.   Yeah, it was an accident, he strangled her.

8           MR. CARNEY:  Thank you, Mr. Martorano.

9           THE COURT:  Mr. Wyshak, any cross-exam?

10                        CROSS-EXAMINATION

11   BY MR. WYSHAK:

12   Q.   Mr. Martorano, Ms. Davis disappeared in 1981, correct?

13   A.   Around there, yeah.

14   Q.   And that's when you were in Florida?

15   A.   Correct.

16   Q.   This conversation with Mr. Flemmi, was it in person or

17   over the telephone?

18   A.   Telephone.

19   Q.   You weren't present at the time anything happened to

20   Debbie Davis --

21   A.   No.

22   Q.   -- is that fair to say?

23   A.   No, I wasn't.

24   Q.   And you said -- you used the word "cryptic," what does

25   that mean?  Can you explain that to the jury?

```
 1    A.   Well, even on telephones we wouldn't come right out and

 2    say something, you'd have to talk around it.

 3    Q.   So you didn't discuss in detail --

 4    A.   No details, no.

 5         MR. WYSHAK:  Nothing further.

 6         THE COURT:  Any redirect?

 7                      REDIRECT EXAMINATION

 8    BY MR. CARNEY:

 9    Q.   When you had this conversation with him, Mr. Martorano,

10    did you ask him how it was possible to accidentally strangle a

11    person to death?

12    A.   I probably did, I'm not positive.

13    Q.   And did he give you the answer?

14    A.   He said it was an accident.

15    Q.   Did you reply --

16         MR. WYSHAK:  Objection.  It's not -- it's beyond the

17    scope of cross, your Honor.

18         THE COURT:  Counsel -- well, sustained as to that

19    question, counsel.

20    BY MR. CARNEY:

21    Q.   Did you have a response to him when he said --

22         MR. WYSHAK:  I object, it's the same question.

23         THE COURT:  Well, counsel, are you asking him as

24    follow-up to his last answer?

25         MR. CARNEY:  Yes.
```

```
 1              THE COURT:  Okay.

 2              Why don't you ask him that question.

 3   BY MR. CARNEY:

 4   Q.   Did you ask him --

 5              MR. WYSHAK:  Can I have a page, then -- since

 6   Mr. Carney is standing up before the jury reading from a

 7   document, may have at least the page reference?

 8              MR. CARNEY:  Page 337.

 9   BY MR. CARNEY:

10:26 10   Q.   Did you ask him, Mr. Martorano, how is that possible --

11              MR. WYSHAK:  337 of what document, please?

12              MR. CARNEY:  The deposition of John Martorano

13   conducted on July 25, 2006, where he testified under oath.

14   BY MR. CARNEY:

15   Q.   Did you ask him how it was possible to accidentally

16   strangle a person?

17   A.   I don't recall, I could have.

18   Q.   Okay.

19              MR. CARNEY:  May I approach, please?

10:26 20              THE COURT:  You may.

21   BY MR. CARNEY:

22   Q.   Mr. Martorano, I'm going to begin on the previous page,

23   and direct you to line 8 and have you read over to the

24   following page through line 3, just read it to yourself,

25   please.
```

```
 1   A.   Yes.

 2          (Pause.)

 3   A.   That's what I said to you already.

 4   Q.   I'm sorry, can you read right down to line 7.  I'm sorry.

 5          (Pause.)

 6   A.   Yes.

 7   Q.   Does that help your memory with your conversation with

 8   Mr. Flemmi?

 9   A.   Correct.

10:28 10   Q.   After he said to you that he had strangled her and it was

11   an accident, did you ever ask him how that was possible, to

12   accidentally strangle a person?

13   A.   Correct.

14   Q.   And is it fair to say he never went into any further

15   details with you about it?

16   A.   Correct.

17          MR. CARNEY:  Thank you, Mr. Martorano.

18          That's all I have.

19          THE COURT:  Any recross?

10:29 20          (Discussion off the record.)

21                    RECROSS-EXAMINATION

22   BY MR. WYSHAK:

23   Q.   Mr. Martorano, when you were in Florida in 1981 when

24   Ms. Davis disappeared, who was Mr. Flemmi's criminal partner in

25   Boston?
```

1    A.    "Whitey."

2              MR. WYSHAK:  Nothing further.

3              THE COURT:  You're excused, sir.

4              Thank you.

5              THE WITNESS:  Thank you.

6              THE COURT:  Mr. Carney.

7              MR. CARNEY:  Your Honor, would it be possible to take

8    a brief recess, please?

9              THE COURT:  Yes.

10:29 10              Give me one second.

11              Jurors, it's 10:30, I'm not sure if your snacks are

12    upstairs or not, but we'll be hopeful, so we'll take our

13    morning break now.

14              Thank you.

15              THE CLERK:  All rise.

16              (Jury left the courtroom.)

17              THE COURT:  Everyone can be seated.

18              Mr. Carney, is this the time where you needed time to

19    have a conversation?

10:30 20              MR. CARNEY:  Yes, it is, your Honor.

21              THE COURT:  So why don't we --

22              MR. CARNEY:  Excuse me.

23              I've been informed by the marshals that they will be

24    able to leave him on this floor.

25              THE COURT:  Okay.

1          Why don't we take 20 minutes, and then I'll see you

2    back here.  We'll give the jurors 30 minutes.

3          MR. CARNEY:  Thank you, your Honor.

4          THE COURT:  I'll see you back, I'll see counsel back

5    and Mr. Bulger back in 20 minutes.

6          Thank you.

7          (Recess taken.)

8          (Resumed, 10:53 a.m.)

9          THE COURT:  Counsel, before I hear from Mr. Carney, I

10:53 10   just want to back up to address Exhibit 1500, Mr. Wyshak, which

11   you had addressed me about.  I did go back, Mr. Brennan, as I

12   said I would, and based on the testimony of Mr. Davis and the

13   limits of your objection, which as I recalled was just limited

14   to whether or not it was in existence in the time Mr. Davis was

15   in charge, which his later testimony confirmed, I'm going to

16   allow its admission.  I previously said de bene, but I allow

17   its admission.

18         (Exhibit 1500 received in evidence.)

19         THE COURT:  Mr. Carney?

10:54 20   MR. CARNEY:  Did your Honor want to see us at sidebar?

21         THE COURT:  I'll see you at sidebar.

22   SIDEBAR CONFERENCE:

23         THE COURT:  Well, I guess there's no reason to do it

24   at sidebar now, okay?

25         MR. CARNEY:  Oh, but we were going to come to sidebar,

1    so if we do it in open court, that's fine.

2         THE COURT:  Okay, I can't see a reason why we

3    shouldn't do it in open court.

4         MR. CARNEY:  I see no reason.

5         THE COURT:  Okay.

6         MR. CARNEY:  Oh, he's not going to testify.

7         THE COURT:  Okay.

8         (End of sidebar conference.)

9         THE COURT:  Mr. Carney, as I said, given that the jury

10:55 10   is not here, I think it's appropriate to do this in open court.

11   Mr. Carney?

12        MR. CARNEY:  Your Honor, when the jury returns, the

13   defendant will rest.

14        THE COURT:  And have you had an opportunity to talk

15   with Mr. Bulger about his constitutional right to choose to

16   testify or not testify?

17        MR. CARNEY:  He's aware that your Honor is going to

18   question him.

19        THE COURT:  Okay, Mr. Bulger, I just want to address

10:55 20   you directly.  You understand that this is the juncture of the

21   case at which I ask for a decision about whether or not you're

22   going to testify.  Mr. Carney has just represented on your

23   behalf that you're choosing not to testify.

24        THE DEFENDANT:  Correct.

25        THE COURT:  Is that correct?

1          THE DEFENDANT:  That is correct.

2          THE COURT:  And have you done that after careful

3     consideration, sir?

4          THE DEFENDANT:  Yes, I have.

5          THE COURT:  Have you done it after consultation with

6     your attorney?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And are you making this choice voluntarily

9     and freely?

10:56 10          THE DEFENDANT:  I'm making the choice involuntarily

11     because I don't feel -- I feel that I've been choked off from

12     having an opportunity to give an adequate defense and explain

13     about my conversation and agreement with Jeremiah O'Sullivan.

14     For my protection of his life, in return, he promised to give

15     me immunity.

16          THE COURT:  I understand your position, sir, and

17     certainly you're aware that I have considered that legal

18     argument and made a ruling.

19          THE DEFENDANT:  I understand.

10:56 20          THE COURT:  I understand, sir, if you disagree with

21     it, okay?

22          THE DEFENDANT:  I do disagree, and that's the way it

23     is.  And my thing is, as far as I'm concerned, I didn't get a

24     fair trial, and this is a sham, and do what yous want with me.

25     That's it.  That's my final word.

1          FROM THE FLOOR:  You're a coward.

2          THE COURT:  I need silence in the gallery.  Thank you.

3          Mr. Bulger, I understand your position, but my

4   question was a simple one about you've decided not to testify

5   in this case?

6          THE DEFENDANT:  That's my answer.

7          THE COURT:  Okay, you've decided not to testify in

8   this case?

9          THE DEFENDANT:  Correct.

10:57 10    THE COURT:  Thank you.

11         Counsel, I think it makes sense then to call the jury

12  back in shortly and have you rest your case before the jury.

13  Okay.

14         And then I understand there are no rebuttal witnesses?

15         MR. KELLY:  No, your Honor.

16         THE COURT:  Okay.  Counsel, my inclination would be

17  to, after you've rested, to have the jury excused for the day,

18  and then there are a few matters I need to address on the

19  record in terms of findings, and I'll see if Mr. Carney needs

10:57 20  to be heard on any matters.

21         MR. CARNEY:  Do you want me to be heard now?

22         THE COURT:  Well, Counsel, why don't we have you rest,

23  and then I can hear you once we've excused the jury.

24         Counsel, as I suggested before, my intention would be

25  to do closing arguments in a single day, which presumably is

1    now going to be Monday.  And, Mr. Wyshak, you still need the

2    time you asked for?

3            MR. WYSHAK:  I need at least the amount of time I

4    asked for.

5            THE COURT:  Okay.  And that's a total of three hours,

6    Counsel, so some part of that will be your rebuttal.

7            MR. WYSHAK:  I mean, how close is the Court going to

8    hold me to that time?

9            THE COURT:  Well, we can talk about that.  We can talk

10:58 10    about that after we dismiss the jury.  I guess what I'm saying

11    is, I'm going to tell the jury that Monday is going to be a

12    full day, even though they won't get the case until the

13    following day after I instruct them, and I'll talk to you more

14    precisely about the time.

15            MR. CARNEY:  Your Honor, am I interpreting that as,

16    the closing arguments will be Monday, and the charge would be

17    on Tuesday?

18            THE COURT:  Yes.

19            MR. CARNEY:  Your Honor also asked me if I wish to be

10:59 20    heard regarding certain findings you have to make at the

21    conclusion of the evidence.  I do not wish to be heard.  I

22    assume your Honor is referring to *Petroziello*.

23            THE COURT:  Yes, and *Houlihan*, which I had also

24    admitted conditionally at the beginning.  I was going to say

25    something briefly into the record, Counsel.

 1                MR. CARNEY:  I don't wish to be heard.

 2                THE COURT:  Okay.

 3                MR. CARNEY:  Thank you for offering me the

 4       opportunity.

 5                THE COURT:  Okay.  Counsel, anything else we have to

 6       do before I call the jury back in and we excuse them?  And I

 7       think at this point, Mr. Carney, there is no issue telling them

 8       once you've rested that closings will be on Monday?

 9                MR. CARNEY:  I agree, your Honor.

10:59 10          MR. KELLY:  We agree.

11                THE COURT:  Okay.  All right, we can get the jury.

12                (Jury enters the courtroom.)

13                THE COURT:  Mr. Carney?

14                MR. CARNEY:  Yes, your Honor.  The defendant calls no

15       further witnesses, and we rest at this time.

16                THE COURT:  Jurors, as you've just heard, the defense

17       has rested in this case, which means we're now at the close of

18       evidence.  You may recall when I first instructed you before

19       the beginning of evidence that what happens after the evidence

11:02 20       is closed is, there is an opportunity for either side to give

21       closing arguments, and then I give you the final charge, the

22       final jury instructions for you to follow in your

23       deliberations.  At this juncture in the trial, there are a few

24       things I have to take up with the attorneys outside of your

25       presence, so I'm sure you won't protest too much if we

1  discharge you for the day.

2         I do want to advise you that closing arguments in this

3  case will be on Monday.  Monday is going to be a longer day.

4  You won't yet get the case for your deliberations, but you

5  should be prepared to stay on Monday from 9:00 to about 4:30 or

6  5:00 o'clock, okay?  So I just want you to all remember that.

7  We start at the usual time, but we're going to end later in the

8  day.  I expect on Tuesday I will give you my instructions in

9  the morning, and then, after that, I expect that you'll have

11:03 10  this case for your deliberations.  As I said at the beginning

11  of this case, once you start deliberating, you should be

12  prepared to stay for full days, again, about 9:00 to 4:30.

13         It's very important as I discharge you now -- even

14  though the evidence is closed, you do not yet have this case

15  for your deliberations -- it is just as important now for you

16  to follow all of my cautionary instructions as it was during

17  the presentation of evidence.  That is, don't discuss the case

18  with anyone.  Don't let anyone discuss it with you.  Don't

19  listen to any media accounts, watch any media accounts, do any

11:04 20  outside research, and keep an open mind about the case.  We'll

21  see you on Monday.  Have a very good weekend.  Thank you.

22         THE CLERK:  All rise for the jury.

23         (Jury excused.)

24         THE COURT:  Everyone can be seated.

25         Counsel, Mr. Carney, any motions you want to bring to

1    my attention at this point?

2        MR. CARNEY:  No, your Honor.

3        THE COURT:  Counsel, as I said before, given that

4    we're at the close of all of the evidence in this case, I

5    understand, Mr. Carney, you're not seeking to be heard on

6    *Petroziello* or *Houlihan*, but I think it's prudent for me to

7    make certain findings for the purposes of the record,

8    particularly since I indicated I would do so when the issue was

9    raised pretrial.

11:05 10       MR. CARNEY:  I agree, your Honor.

11        THE COURT:  Okay.  Counsel, Mr. Bulger, if you can

12    bear with me as I read my findings into the record.

13        Throughout this trial, there have been the

14    introduction of statements of various co-conspirators admitted

15    in evidence pursuant to Rule 801(d)(2)(E), pursuant to *U.S. v.*

16    *Petroziello*, 548 F. 2d 20, 23 (1st Cir. 1977) and its progeny.

17    You may recall, Counsel, there were certain co-conspirator

18    statements -- namely, the statements made in Mr. Flemmi's

19    informant file and the defendant's informant file -- that I

11:06 20    admitted conditionally at the beginning of this trial pursuant

21    to Rule 104(a), subject to formal findings at the close of all

22    evidence.  I indicated that at the June 3, 2013 final pretrial,

23    and that's Docket 1010 at 17 to 18.

24        The burden that the government needs to meet in

25    regards to the basis for the admission of such statements is by

1    a preponderance of the evidence; that is, whether or not it's

2    more likely than not that the defendant, Mr. Bulger, and the

3    declarant, whichever particular co-conspirator was making the

4    statement, were members of a conspiracy when the statements

5    were made and the statements were made in furtherance of the

6    conspiracy.

7         As to the informant files, the files of the defendant

8    would also be admissible as admissions of a party opponent, but

9    as to those informant files, both of the defendant and

11:07 10   Mr. Flemmi, I conditionally admitted them based upon the

11   government's proffer of what the evidence would be.  And my

12   memory is, Mr. Brennan, you were not inclined to object if the

13   evidence met that proffer during the course of the trial, which

14   I find that it does; and that's based on non-hearsay testimony

15   and non-co-conspirator statements that were otherwise presented

16   during the course of this trial, including the testimony of

17   Mr. Flemmi, Mr. Morris, and others.

18        The informant files made by or reflecting statements

19   made by the defendant and Mr. Flemmi as part of the charged

11:08 20   conspiracy, that's the charged conspiracy charged in Count I,

21   the racketeering charge, which is alleged to have stretched

22   back until 1972, and I find they were made and in furtherance

23   of the conspiracy.  There was reference made by Mr. Flemmi to

24   those relationships as a quid pro quo relationship, and

25   certainly the relationship with Mr. Connolly, and to a certain

1    extent with Mr. Morris, were key to the racketeering

2    conspiracy.

3              To the extent that other statements of other

4    co-conspirators were admitted during the course of this trial,

5    I want to briefly address those as well.  There are various

6    alleged co-conspirators that were, again, charged in the RICO

7    racketeering conspiracy charge in Count I, which also included

8    several conspiracies as racketeering acts themselves, are

9    predicates to the racketeering conspiracy; namely, an extortion

11:09 10   conspiracy, extortion conspiracy as to the collection of

11   so-called rent, Racketeering Act 21, and extortion conspiracy

12   as to Racketeering Act 24, the fines or the collection of fines

13   by the Winter Hill organization.  There's also a narcotics

14   distribution conspiracy charged, Racketeering Act 29, and a

15   money laundering conspiracy, Racketeering Act 30.

16             There are also various conspiracies to murder, charges

17   that were also predicates charged in Count I, Racketeering

18   Acts 1, 7, 10, 13, and 17.  In regards to the Notarangeli

19   group, conspiracy to murder members of that group, Mr. Sousa,

11:10 20   Mr. King, Mr. Wheeler, and Mr. Callahan all were charged as

21   part of the overarching conspiracy that the defendant,

22   Mr. Flemmi, Mr. Weeks, Mr. Martorano, and others were members

23   of and associated with the Winter Hill Gang, which engaged in

24   earning money and otherwise profiting from extortion, loan-

25   sharking, bookmaking, drug trafficking, and committing violent

1    crimes, including, as I said, murder, not just the conspiracies

2    to murder but the other murders charged in the racketeering

3    conspiracy.

4         I think there was certainly a showing by a

5    preponderance of the evidence that these acts were committed to

6    promote, enable, and protect the Winter Hill's criminal

7    activity, and those statements were admitted in the course of

8    this trial in the absence of a specific objection to the vast

9    majority of them, Mr. Carney, and I note I addressed the few

11:11 10   Rule 801(d)(2)(E) objections that arose as the defense raised

11    them during the course of trial.  I will make my findings here

12    in terms of categories in the absence of specific objections as

13    each of those statements were admitted at trial.

14         I will make reference for ease of reference to the

15    various organizational charts that were admitted during the

16    course of this trial; namely, Exhibit 96, which is the chart of

17    the Winter Hill organization's leadership circa 1975,

18    Exhibit 94, which was the Winter Hill organization circa 1975

19    to 1980.  Counsel, I couldn't recall what number the exhibit

11:12 20   was for the Winter Hill organization circa 1982 that has, in

21    addition to the leadership, also has Mr. Connolly,

22    Mr. Schneiderhan, and a number of other individuals who are

23    listed on Docket 94, but I rely on that as well; and I rely

24    upon the information and the drug trafficking conspiracy

25    organizational chart, which I believe, Counsel, was admitted as

1    Exhibit 90.

2         Counsel, I do find as to these statements, as I did in

3    regards to the confidential informant files, that these

4    statements were made while the defendant and the declarant were

5    members of the conspiracy, while the conspiracy was ongoing

6    they were made, and that they were made in furtherance of the

7    conspiracy.  I find this as to statements made as to the

8    overall Winter Hill organization, operation and enterprise,

9    particularly as to the statements of Mr. Flemmi, Mr. Martorano,

11:14 10   Mr. Weeks, George Kaufman, Howard Winter, and the other

11   leadership reflected on Exhibit 96, but also as to the

12   statements of various subordinates of the organization, as

13   reflected on Exhibit 94, and in regards to the drug-trafficking

14   operation.  There are various lines of illegal and criminal

15   business, including bookmaking, gambling, and I make particular

16   note of the testimony of Mr. O'Brien, Mr. Katz, and Mr. Raso,

17   as well as to the drug operation, and I make reference to the

18   testimony of Mr. Tower, Mr. Billy Shea, Mr. Moore.

19         I also find that the statements that were made in the

11:15 20   course of extortion were also made in furtherance of the

21   conspiracy.  I rely upon testimony in this trial, including but

22   not limited to the testimony of Mr. Lindemann, Mr. Solimando,

23   and Mr. Buccheri in regards to the fines that were collected as

24   a form of extortion, and also the testimony of, as I said,

25   Mr. Katz, Mr. O'Brien, and others in regards to the collection

1    of rent, also a form of extortion.

2         I also find that those statements that were made by

3    various co-conspirators, including those that led to murder or

4    conspiracy to murder in the course of extortion or the

5    collection of fines or rent, that also those murders that were

6    perpetrated to protect the Winter Hill Gang from law

7    enforcement prosecution -- namely, the murders of Mr. McIntyre,

8    Mr. Halloran, Mr. Donahue, Mr. Callahan -- or that were

9    committed to protect the Winter Hill organization from

11:16 10    competition, and those were the earlier charged homicides, the

11    earlier predicates that were part of the racketeering Count I

12    conspiracy, the gang wars that were described by several of the

13    witnesses in this case, including Mr. Martorano.

14         The same is true as to co-conspirator statements of

15    Mr. Flemmi, Mr. Morris, Mr. Connolly regarding information

16    received by the Winter Hill Gang from law enforcement officers,

17    but also information given to those law enforcement officers,

18    including, Mr. Carney, including false information to divert

19    attention from the culpability of various members of the Winter

11:17 20    Hill Gang for various crimes, including murder, including

21    diverting attention from Mr. Bulger himself.  All of these acts

22    were done to promote and protect the Winter Hill Gang and were

23    in furtherance of the conspiracy that has been charged in this

24    case.  And the same is true as to the money laundering

25    conspiracy that was charged involving Mr. Weeks, Mr. Bulger,

and Mr. Flemmi, and I rely upon the testimony of Mr. O'Neil,

Mr. Weeks, and the other evidence that was submitted in regards

to money laundering as to the businesses, the two businesses in

South Boston.

I note that I rely in making these findings on, as I

said, not the co-conspirator statements themselves but other

evidence in this case for finding that they were all properly

admitted.

In conclusion, I find by a preponderance of the

evidence that it's more likely than not that it has been proven

by the government at this point at the close of all evidence

that this conspiracy as charged in Count I existed, involved

the members that I've made reference to and are reflected in

the organizational charts, that the statements were made during

the course of the conspiracy and in furtherance of the

conspiracy.

Counsel, I just briefly want to address *Houlihan*

findings.  Looking back at the final pretrial arguments on

June 7 of 2013, Docket 1012 at 11 to 13, I admitted

conditionally the statements that were proffered of

Mr. Halloran, Mr. McIntyre, and Mr. Castucci, various

statements that they made to law enforcement officers before

their murders.  Those were admitted conditionally subject to my

findings at the close of evidence.  I also note there wasn't

any specific objection to them during the course of the trial,

1       but I make these protectively for the purposes of the record.

2              I find that there was evidence presented at trial that

3       shows that the defendant, Mr. Bulger, conspired with others to

4       murder these three individuals, at least in part to prevent

5       their cooperation in law enforcement and to avoid prosecution

6       of Mr. Bulger and other members of the Winter Hill Gang; and

7       that was tantamount to a knowing waiver of Mr. Bulger's right

8       to confront those witnesses, had they been alive to testify at

9       trial.  Mr. Halloran's statements, as I recall, were introduced

11:20 10    during the testimony of Mr. Montanari.  Mr. McIntyre's

11      statements were offered through the testimony of Mr. DeFago,

12      and Mr. Castucci's statements were offered through the

13      testimony of Mr. Daly.  For all of those reasons, I think there

14      has been a sufficient showing made that they were properly

15      admitted under Rule 804(b)(6) and the First Circuit's decision

16      in *Houlihan*, 92 F. 3d 1271, 1278 (1st Cir. 1996).

17             Counsel, there are a few other matters I just wanted

18      to address with you.  As to the jury charge, just so we're all

19      clear, what I will be giving as the jury charge on Tuesday,

11:21 20    Counsel, as I indicated, the only changes are, Mr. Carney, I

21      made the change as to the "conspiracy to murder" language that

22      you asked me to, both in the charge and the verdict form.  The

23      addition of the substantial assistance instruction that I

24      shared with counsel this morning will be added after the

25      instruction caution as to certain witnesses.  And as of this

1    moment, it does not contain any instructions on the forfeiture

2    issue, but does counsel want to be heard on that further at

3    this point?

4        MR. KELLY:  On the forfeiture matter, no.  We'd like

5    to discuss it further with counsel, if we could, following

6    today's hearing.

7        THE COURT:  Okay.  I would just ask counsel to inform

8    Ms. Hourihan before the close of business today about what the

9    parties' positions are on that.  And obviously the verdict form

11:22 10    will stay as is.

11        In terms of the exhibits, after closing arguments, I

12    will ask counsel to verify on the record to Ms. Hourihan that

13    all of the exhibits are in order, both in the hard-copy form

14    that they'll be submitted to the jury but also on the disks of

15    the exhibits that will be uploaded to the JERS system.

16        Counsel, anything else that I need to address with you

17    at this moment?

18        MR. KELLY:  One matter, your Honor.  We would

19    respectfully make one request, and that is, in light of the

11:23 20    close of evidence, in light of Mr. Bulger's decision not to

21    testify, there will no doubt be great media interest in

22    discussing with Mr. Carney his client's decision; and we would

23    ask that the Court advise defense counsel not to appear in

24    front of the TV cameras as they did yesterday when they left

25    the court.  We'd request that the Court advise defense counsel

1    not to go on camera and expound upon the client's Fifth

2    Amendment privileges.  We think this is an especially sensitive

3    time, and as much as we have all enjoyed spending the summer

4    with your Honor, we'd prefer not to do it again.  And we do not

5    want any undue publicity being created today that may in fact

6    affect the jurors over the weekend, so we make that request

7    under the local rules, your Honor.

8         THE COURT:  Mr. Carney, do you want to be heard?

9         MR. CARNEY:  I'm aware of the local rule, your Honor,

11:24 10   and I have consistently complied with it, and I intend to

11    consistently comply with it in the future.

12         MR. KELLY:  Consistency is what concerns me here, and

13    I would request that he not consistently go out of this

14    courtroom and talk to the cameras about his client's decision

15    here today.  We all respect that decision, but it's not

16    appropriate for him now to go in front of the media cameras as

17    he leaves here and argue the merits of why he did what he did

18    or did not do because there's grave danger, and it may in fact

19    come across to the jurors.  And the Court has warned the

11:24 20   jurors, but we just don't want any undue publicity being

21    created by counsel, and that's why we're requesting it.

22         THE COURT:  Well, Counsel, I think my ruling on

23    adopting the local rule as an order still remains, Mr. Carney,

24    and my memory is that any reference to public proceedings must

25    be made without commentary, if I'm recalling correctly.  I know

1    that you're familiar with the local rule and my order, and I

2    expect that it will be abided by despite your motion to have me

3    vacate it, which I deny.

4         MR. CARNEY:  I understand, your Honor, but the local

5    rule explicitly permits two occasions when counsel can make

6    during-the-trial comment, and I don't think the government can

7    change what the local rule says.  I will comply fully with the

8    local rule to the best of my ability.

9         THE COURT:  That's what I was saying, Counsel.

11:25 10         MR. CARNEY:  Yes.

11         THE COURT:  Okay.  Counsel, closing arguments,

12   Mr. Wyshak, did you want to be heard on time?  And let me

13   preface this by saying, I am as well aware as anyone who sat in

14   this courtroom about how much evidence was presented to this

15   jury on many topics, 32 counts, 33 racketeering acts, and I

16   understand that both sides have a lot of ground to cover.  On

17   the other hand, I want you to consider both the jurors'

18   attention throughout this trial but also their ability to

19   synthesize and stay focused on a lengthy closing argument.

11:26 20         MR. WYSHAK:  Your Honor, clearly I'm very sensitive to

21   that, your Honor.  I was just wondering how strictly we would

22   have to adhere to a time limit.  I do want to preserve half an

23   hour for rebuttal.  So, you know, if I went, instead of two and

24   a half hours, two hours and 45 minutes, I just want to make

25   sure that that's not going to cut into the rebuttal time.

1         THE COURT:  Okay.  Well, I guess what I'm saying is,

2   at the end of the day I'm going to give -- they may choose to

3   use it or not, but I'll give the same amount of total time that

4   I give to you to Mr. Carney and Mr. Brennan.  So if you're

5   asking me for slightly more time, I will reluctantly allow

6   that, Counsel.

7         MR. WYSHAK:  Thank you.

8         THE COURT:  But I will also allow Mr. Brennan and

9   Mr. Carney, who I understand are splitting the closing, to do

11:27 10   so of the same amount, the same amount of time.

11         MR. WYSHAK:  One other question I had.

12         THE COURT:  So that's 15 minutes more, Counsel.

13         MR. WYSHAK:  Generally we don't have transcripts

14   available, but on occasions when transcripts are available, I

15   have told the jury that the transcripts are available if they

16   want to hear a read-back of any particular witness's testimony.

17   I know that -- and I think this comes more from local practice

18   than federal practice -- but the local practice seems to

19   discourage read-backs of prior testimony, and I just want to

11:28 20   make sure that I don't tread into that area if it's the Court's

21   practice not to allow read-backs.

22         THE COURT:  Yes, and I think, Counsel, my memory is,

23   in my initial instructions to them I made clear that a final

24   transcript would not be available to them.  I think it was in

25   reference to whether or not they wanted to choose to take

1   notes.  So I don't think any suggestion should be made to them

2   about a transcript beyond that.  I can't remember what I say in

3   the final instructions, but I know I made that initial

4   instruction to them at the beginning of the case.

5           MR. WYSHAK:  Thank you.

6           THE COURT:  And, Counsel, it's occurred to me,

7   especially now that you've asked me for 15 more minutes, or at

8   least a margin of 15 more minutes, Counsel, I was planning,

9   obviously, if we're going the full day, to have obviously the

11:29 10   government close in the morning; but it seems to make sense,

11   Mr. Wyshak, if we take a brief break somewhere in your closing.

12   Is there a place where we could take it at sort of the midpoint

13   because I think there's going to be, I imagine, a natural

14   midpoint with Mr. Carney and Mr. Brennan, meaning when you

15   switch off, however you switch off?  I'm suspecting it's

16   somewhere in the middle.  Okay, so I'm intending to do the same

17   thing with your closing as well.  So is there a natural point?

18   I will be looking to just let them take ten minutes.

19           MR. WYSHAK:  Probably 10:30, an hour and a half into

11:30 20   it.

21           THE COURT:  Okay.

22           THE COURT:  And we'll just take ten minutes.  And then

23   at the end of your principal closing, we'll send them out for

24   what will essentially be an early lunch, and so we'll take the

25   hour then.  And then Mr. Carney and Mr. Brennan will be after

```
 1    lunch, and about at the one-hour, one-hour-and-a-half mark, I'd

 2    want to take ten minutes, so we'll do that.  And then,

 3    Mr. Wyshak, you said 30 minutes rebuttal?

 4              MR. WYSHAK:  Yes, your Honor.

 5              THE COURT:  Okay.  Anything else, Mr. Carney?

 6              MR. CARNEY:  No, your Honor.

 7              THE COURT:  Mr. Brennan?

 8              MR. CARNEY:  Thank you.

 9              THE COURT:  Anything else from the government?

11:30 10              MR. KELLY:  No, your Honor.  Thank you.

11              THE COURT:  As I said, the only thing I would ask is

12    that counsel get back to the Court before the end of the day

13    about the forfeiture matter.  Thank you.

14              THE CLERK:  All rise.

15              (Adjourned, 11:31 a.m.)

16                          CERTIFICATION

17          We certify that the foregoing is a correct transcript

18    of the record of proceedings in the above-entitled matter to

19    the best of our skill and ability.

20

21    /s/Debra M. Joyce                  August 2, 2013
      Debra M. Joyce, RMR, CRR          Date
22    Official Court Reporter

23

24    /s/Lee A. Marzilli                 August 2, 2013
      Lee A. Marzilli, RMR, CRR         Date
25    Official Court Reporter
```

1                              INDEX

2

3   WITNESS                                                    PAGE

4

    DESI SIDEROPOULOS
5
        Direct Examination                                     12
6       By Mr. Carney
        Cross-Examination                                      39
7       By Mr. Kelly
        Redirect Examination                                   46
8       By Mr. Carney
        Recross-Examination                                    48
9       By Mr. Kelly

10  JOHN MARTORANO

11      Direct Examination                                     58
        By Mr. Carney
12      Cross-Examination                                      65
        By Mr. Wyshak
13      Redirect Examination                                   66
        By Mr. Carney
14      Recross-Examination                                    68
        By Mr. Wyshak
15

16

17                          E X H I B I T S

18

    Exhibit No.           Description                    Received
19

20    1371              FD-209                               19

21    1373              FD-209                               26

22    1372              FD-209                               27

23    1403, 1404    Excerpts of Marion Hussey deposition     57
                    and trial transcripts
24
      1500              FBI regulation                       70
25